UNITED STATES of America,
Plaintiff–Appellee–Cross–Appellant,

v.

Gary A. SKILLMAN,
Defendant–Appellant–Cross–Appellee.

Nos. 89–50203, 89–50267.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 1990.

Decided Sept. 14, 1990.

Amended Jan. 3, 1991.

Irving Gornstein, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee-cross-appellant.

H. Dean Steward, Directing Atty., Federal Public Defender, Santa Ana, Cal., for defendant-appellant-cross-appellee.

Before HUG, SCHROEDER and HALL, Circuit Judges.

HUG, Circuit Judge:

Defendant-appellant Gary A. Skillman ("Skillman") appeals his conviction for his role in burning a cross outside the Westminster, California home of the Heissers, a black family. Skillman was convicted on three counts: (1) conspiring to intimidate the Heissers on account of race in the free exercise and enjoyment of their right to hold and occupy a dwelling, 18 U.S.C. § 241 (1988); (2) intimidating the Heissers for the same purpose, 42 U.S.C. § 3631 (1982); and (3) using fire to commit a felony, 18 U.S.C. § 844(h)(1) (1988). Skillman was sentenced to 37 months in prison. Skillman appeals, contesting the admissability of certain evidence, the sufficiency of the evidence for conviction, the adequacy of the conspiracy instructions, and the application of the increase in sentence under the Guidelines because the offense was against vulnerable victims. The Government cross-appeals, contending the district court erroneously gave credit under the Sentencing Guidelines for Skillman's acceptance of responsibility. We affirm the conviction and remand on the Government's cross-appeal.

## I. FACTS

Viewed in the light most favorable to the Government, the evidence presented at trial showed the following: Between 4:15 and 4:30 a.m. on July 28, 1988, Jerry Hartman

("Hartman") visited Skillman at his Westminster home. Skillman was working on his bicycle in his garage. Jeff Mayberry ("Mayberry"), whom Hartman did not recognize, was also in the garage building a cross with materials from the garage. Hartman testified that Skillman picked up and showed him the cross and said they were making it to put in someone's yard. In a tape of Skillman's interview with two members of the Westminster Police Department, which was played for the jury, Skillman responded affirmatively to this police question: "You got the cross or he [Mayberry] got the cross? You guys got on your bicycles and you got the [Valvoline] container of fluid and you rode down the street?" On August 8, 1988, Skillman also told Federal Bureau of Investigation Special Agent Ellis Kupferman that the cross had been built in Skillman's garage and that he and Mayberry had bicycled to the Heissers' home.

Neither Skillman nor Mayberry testified. There was therefore no direct proof concerning the acts of Skillman and Mayberry at the Heisser home. However, in the Skillman tape, Skillman told the police that Mayberry doused, planted and lit the cross on the Heisser lawn. Further, James Milum ("Milum"), the stepfather of Skillman's girlfriend, Cathy McElvey, testified that in June, 1988 (before the incident in question), Skillman said he was tired of a "nigger" family in the Indian Village portion of Westminster and would burn a cross in the yard. Between 8:30 and 9:00 a.m. on the morning of the cross burning, Skillman found Milum having coffee at the Iron Horse Saloon. In Milum's words Skillman told him: "They'd burnt the cross in the early mornings in Indian Village, and that . . . if he had friends he could have trusted more . . . he'd have popped a few caps at them; also meaning shoot a gun." Skillman thought the police were looking for him and asked Milum to take him away. Milum declined. On the next afternoon, Skillman showed up at Milum's door and asked to stay at Milum's home, which was purportedly outside the jurisdiction of the Westminster police. This request was again rejected. Sally Hartman testified that her son Jerry told her Skillman had shown him the cross and that they were going to put it in someone's yard.

A fair amount of evidence was also introduced concerning Skillman's racial hatred. Westminster Police Department Detective Merle Hinton seized two items from Skillman's garage on the morning of the incident: (1) a paper target of a black man running away with puncture holes likely made by a metallic object like a dart (entitled "Official Runnin' Nigger Target" and with the note: "All body shots count 5. Shots to head do not count unless metal piercing cartridge is used.") ("Exhibit 3"), and (2) a brown paper bag with the initials "GS," "JM," and "WIV," a swastika in a circle, and the statement "Westminster No. 1, White Power Mr. J.M." Becky, a juvenile and friend of Skillman, testified Skillman made statements such as "kill the nigger" and drew swastikas and the words "white power." [1] She also said he had a "White Pride" tattoo on the back of his arm. He also asked Becky, a former member of the "skinhead" group, if he could go to a skinhead picnic. In a routine police inventory after Skillman's arrest, a poem containing racial epithets was discovered on the back of a business card in Skillman's wallet.

## II. SUFFICIENCY OF THE EVIDENCE

██ Skillman challenges the sufficiency of the evidence for his conviction, contending he was "merely present" at the scene of the crime. The sufficiency of the evidence is reviewed in the light most favorable to the Government to determine if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

██ It is well-settled that mere presence at the scene of the crime is insufficient to connect a defendant to a conspiracy beyond

1. Because she was a juvenile, Becky's full name was not identified at trial.

a reasonable doubt. *See, e.g., United States v. Melchor–Lopez*, 627 F.2d 886, 891 (9th Cir.1980). Once a conspiracy is established, the defendant must only have a slight connection to link him with the conspiracy. *United States v. Hernandez*, 876 F.2d 774, 779 (9th Cir.), *cert. denied*, ––– U.S. –––, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989).[2] This slight connection may be demonstrated by proof of the defendant's willful participation in the illegal objective with the intent to further some purpose of the conspiracy. *United States v. Weaver*, 594 F.2d 1272, 1274 (9th Cir.1979) (citation omitted).

■ We find the evidence was sufficient to support Skillman's conviction. First, sufficient circumstantial evidence was introduced to establish the existence of a conspiracy to intimidate and interfere with the Heissers' rights to occupy their home. The testimony of Hartman, buttressed by that of his mother, and Milum independently demonstrated an agreement for an illegal plan. The necessary intent is demonstrated by the evidence of racial animus.

The requisite "slight connection" was established when Skillman transported the Valvoline container. Skillman disputes that his taped police interview can be so construed. However, on appeal this evidence must be viewed in the light most favorable to the Government. Even if we were to overlook this testimony, we would still conclude that the evidence established the necessary "slight connection." Milum's testimony that Skillman stated he had participated in the cross burning, as he planned, is significant, particularly in view of the testimony of Milum and the Hartmans about Skillman's actions prior to the burning of the cross. Further, Becky had

testified that Skillman stated that he had blamed the cross burning on skinheads in order to avoid going to jail. The testimony of these witnesses provides independent support for each other since Skillman's trial motion to exclude witnesses from the courtroom was granted. While mere proximity to the scene of the burning is not sufficient alone to establish involvement in the conspiracy, Skillman's presence does provide additional support for the finding of his involvement. *See United States v. Penagos*, 823 F.2d 346, 348 (9th Cir.1987).

### III. ADMISSION OF "SKINHEAD" EVIDENCE

Skillman argues the district court abused its discretion under Fed.R.Evid. 403 in admitting certain "skinhead" testimonial evidence because it was unfairly prejudicial and cumulative.

■ To prevail, Skillman must show the admission of this evidence, under the Rule 403 balancing standard,[3] was first an abuse of discretion. *See, e.g., United States v. Layton*, 767 F.2d 549, 553 (9th Cir.1985). That is, the probative value of relevant evidence (under Fed.R.Evid. 401 and 402) was substantially outweighed by Rule 403 factors. *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 529 (9th Cir.1986). Further, if an abuse of discretion, Skillman must establish the evidentiary ruling constituted more than harmless error; that is, it affected Skillman's substantial rights. *See United States v. Shirley*, 884 F.2d 1130, 1132 (9th Cir.1989); *see also* Fed.R. Evid. 103(a); Fed.R.Crim.P. 52(a).

There was no evidence that Skillman was a member of the skinheads. Skillman presented a motion *in limine* to exclude

---

**2.** Traditionally, to establish the existence of a conspiracy (under 18 U.S.C. § 371 (1988)), the Government must demonstrate: "1) an agreement to accomplish an illegal objective, 2) coupled with one or more acts in furtherance of the illegal purpose, and 3) the requisite intent necessary to commit the underlying substantive offense." *United States v. Penagos*, 823 F.2d 346, 348 (9th Cir.1987). Circumstantial evidence may prove the existence of a conspiracy. *Id.*
Unlike the common conspiracy pursuant to 18 U.S.C. § 371 (1988), and as discussed in Section

VI, *infra*, a conspiracy under 18 U.S.C. § 241 (1988) does not have an overt act requirement.

**3.** Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

any reference to the term "skinhead" during the trial. At trial, Skillman specifically objected to the introduction of evidence that Skillman asked Becky if he could attend a skinhead picnic but was refused. The motion was denied because the court concluded the skinhead evidence together with other evidence would tend to show Skillman would act on his racial beliefs.[4]

■ The Government correctly argues that the skinhead evidence was relevant for Count II of the indictment for intimidating or interfering with a person's housing rights on account of "race" or "color." 42 U.S.C. § 3631 (1982). Further, Skillman's statement to Becky that he blamed the skinheads to avoid jail time was relevant to whether his involvement was more than merely being present.

The critical question is whether the probative value of relevant evidence was "substantially outweighed by the danger of unfair prejudice" or was "needless presentation of cumulative evidence." "Unfair prejudice," within the meaning of the rule, occurs when the evidence has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 advisory committee's note; *see also United States v. Layton*, 855 F.2d 1388, 1402 (9th Cir.1988) ("Rule 403 precludes only *unfair* prejudice.") (emphasis in original), *cert. denied*, 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989); *United States v. Bailleaux*, 685 F.2d 1105, 1111 & n. 2 (9th Cir.1982) (prejudice alone is insufficient; *unfair* prejudice is required). It is evidence which "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish," or otherwise "may cause a jury to base its decision on something other than the established propositions in the case." 1 J. Weinstein & M.

Berger, *Weinstein's Evidence*, ¶ 403[03], at 403–36 to 403–39 (1989 ed.).

Skillman principally relies on *United States v. Gillespie*, 852 F.2d 475, 479 (9th Cir.1988), where we found it was an abuse of discretion to admit evidence of homosexual conduct of the appellant with his adoptive father in a case where the appellant was charged with transporting his three-year-old goddaughter for illegal sexual purposes. *Gillespie* is inapposite since the alleged homosexual conduct did not tend to establish a violation of the statutes in issue. Here, the skinhead evidence tended to establish Skillman's racial animus and that he might act on his beliefs. Skillman also contends that the skinhead references were cumulative to other animus evidence, including Exhibit 3, the business card with the racist poem found in his wallet as well as Milum's and Becky's testimony on Skillman's prior race statements. We conclude this evidence was not "needless[ly]" cumulative in light of the difficulty in establishing the requisite racial animus and Skillman's theory-of-defense that he was a mere passive bystander at the crime. The district court's evaluation under Rule 403 and the admission of the evidence was not an abuse of discretion.

## IV. MILUM TESTIMONY

■ Skillman asserts the district court abused its discretion in denying his motion to exclude Milum's testimony that Skillman told him "if he had friends he could have trusted more ... he'd have popped a few caps at them." This testimony was also referenced in the Government's closing argument. Skillman argues this testimony was irrelevant to any count in the indictment, concerned simply an after-the-fact boast of the cross burning, was made by a witness whose credibility was questionable

---

4. Before the jury, the following skinhead references were made. Becky admitted she had once been a member of the skinheads. Becky had asked Skillman at a liquor store why he had blamed the cross burning on the skinheads to the media. She testified that Skillman said he would have gone to jail if he hadn't. Becky was upset because "all the skinheads in the neighborhood ... were getting blamed for it." The

Government's opening statement referred to this testimony. As noted, Skillman had expressed an interest in attending a skinhead picnic. Finally, Special Agent Kupferman testified that he was familiar with the skinheads and their beliefs: "They are generally racist; they are a neo-Nazi type of group; I believe they first started in Great Britain. They espouse racial purity and white power, and they tend to be violent."

in light of Milum's prior felony conviction,[5] and was prejudicial under Fed.R.Evid. 403.

There is no assault charge in the indictment. However, as the Government argues, the evidence was relevant to show that Skillman had the requisite intent to commit the crime to "intimidate" the Heissers and that he was serious and not intending a prank. The district court found this evidence relevant in response to Skillman's "mere presence" argument as tending to show that Skillman participated in the offense. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Milum's credibility was a proper matter for the jury to assess in determining the reliability of the evidence. There was no abuse of discretion in admitting this evidence.

## V. EXHIBIT 3

Skillman argues the district court abused its discretion in admitting Exhibit 3, a xerox copy of a target (entitled "Official Runnin' Nigger Target") in violation of the best evidence rule and because certain handwriting was not connected to Skillman.

The best evidence rule is set forth in Fed.R.Evid. 1002, requiring the original in order "[t]o prove the content of a writing ... except as otherwise provided in these rules...." Detective Hinton, who had seized Exhibit 3 from Skillman's garage on the morning of the cross burning, testified that he did not know where the original was but that it had been turned over to the FBI.

The Government correctly argues that Exhibit 3, as a duplicate, was properly admitted pursuant to Fed.R.Evid. 1003.[6] The district court found there was no genuine issue of authenticity raised, pursuant to Rule 1003(1). The primary thrust of the objection was that Exhibit 3 contained two handwriting additions (at the top and bottom) which Skillman denied were his. This extraneous handwriting was entirely incomprehensible to the district court. It was suggested that the handwriting was added by the Westminster Police Department. No persuasive argument of unfairness under Rule 1003(2) was presented. There was also no evidence Exhibit 3 was lost in bad faith.

Even assuming *arguendo* Exhibit 3 was erroneously admitted, Skillman has not established its admission was more than harmless error. *See* Fed.R.Evid. 103(a). Fed.R.Crim.P. 52(a). The district court correctly found the additions were not prejudicial. We agree with this conclusion especially since the added handwriting was not clearly decipherable.

## VI. CONSPIRACY INSTRUCTION

Skillman contends that the court erroneously instructed the jury that proof of an overt act was unnecessary to convict under the conspiracy count. However, 18 U.S.C. § 241 (1988) does not require such an element. The statute makes it unlawful for

> two or more persons conspire to injure, oppress, threaten, or intimidate any inhabitant of any State, Territory, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same.

Unlike the general conspiracy statute, 18 U.S.C. § 371 (1988), which expressly requires proof of an overt act, section 241 makes no mention of such a requirement. This has been recognized in numerous cases in other circuits. *See, e.g., United States v. Morado*, 454 F.2d 167, 169 (5th

---

5. In 1977, Milum pled guilty in state court to two felonies.

6. Rule 1003 provides:
 A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original. Fed.R.Evid. 1001(4) defines "duplicate":

 A "duplicate" is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduces the original.

Cir.), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972) (citations omitted); *see also United States v. Umentum,* 547 F.2d 987, 990 (7th Cir.1976) (dicta), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977). If an overt act were required for section 241 in the absence of express language, as Skillman argues, then this civil rights statute would be unduly narrowed in application contrary to congressional mandate. *Cf. United States v. Price,* 383 U.S. 787, 806, 86 S.Ct. 1152, 1163, 16 L.Ed.2d 267 (1966) (noting section 241 must be construed "with full credit to its language"). *But see United States v. Kimble,* 719 F.2d 1253, 1256 (5th Cir.1983).[7]

We consider section 241's legislative history "to determine only whether there is strongly expressed legislative intention contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987). The legislative history contains no indication that an overt act is necessary. In this light, if an overt act were required for section 241, as Skillman argues, then this civil rights statute would be unduly narrowed in application contrary to congressional mandate.

Skillman contends that the failure to require proof of an overt act in the instruction given negates his instruction concerning mere presence at the scene. The pertinent part of the conspiracy instruction, as given, was as follows:

> Therefore, if you find beyond a reasonable doubt that the defendant agreed or conspired with another person with the

intent to deprive [the Heisser family] of their right to occupy their dwelling without intimidation or interference because of their race or color, then the conspiracy was directed at the exercise or enjoyment of a right secured by the Constitution in the United States.

\* \* \* \* \* \*

The key element of proof is the showing as to the defendant that he knew or had reason to know of the participation with him by another in the illegal plan, and that he knew or had reason to know that the results to be derived from the operation were probably dependent upon the success of the entire venture.

It is apparent from the instructions given that the jury had to find more than "mere presence" at the scene of the burning, but rather had to find that Skillman had agreed to the plan and its intent to intimidate the Heisser family.

When the instructions are read as a whole, Skillman's theory-of-defense was not denied. The mere presence instruction made clear that a conviction required Skillman's participation in the offense. To find a conspiracy, the jury had to find Skillman "formed or joined the conspiracy" and had the requisite intent.

## VII. SENTENCING GUIDELINES: VULNERABLE VICTIM

Skillman challenges the district court's finding that his offense level should be increased by two levels because of a victim adjustment under U.S.S.G. § 3A1.1, at 3.1

---

7. *Kimble* involved two brothers—Clayton "Sap" Kimble and Jules Ron Kimbel—who were convicted of conspiracy to violate the Racketeer Influenced and Corrupt Organizations ("RICO") statute and of conspiracy to violate the civil rights of one Russell Griffith (by murdering him). In discussing the elements of RICO conspiracy (18 U.S.C. § 1962), the Fifth Circuit cited *United States v. Phillips,* 664 F.2d 971 (5th Cir.1981) for the rule that an overt act is required. 719 F.2d at 1256.

Inexplicably, the *Kimble* court then relied on *Phillips* to hold that "[t]o convict defendants of conspiracy to violate Russell Griffith's civil

rights, *contrary to 18 U.S.C. § 241,* the government must prove that [inter alia] ... an overt act was committed in furtherance of the conspiracy." *Id.* (emphasis added). Thus, it appears that the *Kimble* court actually ignored the language of § 241 and applied *Phillips,* a RICO case which had nothing to do with civil rights. Moreover, it had done so without mentioning a prior Fifth Circuit case, *Morado,* 454 F.2d at 169, which had held that § 241 does not require an overt act.

For reasons which we consider obvious, we decline to follow *Kimble.*

(Nov. 1989). The Guideline and the accompanying commentary provide:

§ 3A1.1. *Vulnerable Victim*

If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

*Commentary*

*Application Notes:*

1. This adjustment applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the defendant. The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim. But it would not apply in a case where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.

2. Do not apply this adjustment if the offense guideline specifically incorporates this factor.

The part of the Guideline that is pertinent to this case may be condensed to read

If the defendant knew or should have known ... that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

Commentary No. 1 deals with the "unusually vulnerable" victim due to age, physical or mental condition. No specific explanation or examples are given relative to the victim "that is particularly susceptible to the criminal conduct."

Commentary No. 2 pertains to both the unusually vulnerable victim and the particularly susceptible victim. It precludes the application of the adjustment "if the offense guideline specifically incorporates this factor." Skillman argues that the Guidelines applied for the three offenses do specifically incorporate this factor. A similar argument has been considered and rejected by the Sixth Circuit. *United States v. Salyer,* 893 F.2d 113, 115–16 (6th Cir. 1989).

There are three Guidelines used to derive the offense level, § 2H1.2 for the conspiracy,[8] § 2H1.3 for the violation of the Fair Housing Act § 3631,[9] and § 2K1.4 for the use of fire in commission of a felony.[10] There is nothing in any of the three Guidelines applied in this case that incorporates an enhancement for victims that are particularly susceptible to the criminal conduct.

■■■ Skillman also asserts that the adjustment constitutes double counting because U.S.S.G. § 2K1.4(b)(4), at 2.101 (Nov. 1989) provides for an adjustment increase of seven levels for aiding and abetting the use of fire in the commission of a felony, under 18 U.S.C. § 844(h)(1) (1988). We find no double punishment in applying a Guideline dealing with the means by which a crime was committed (use of fire) and a Guideline dealing with the susceptibility of

---

8. This guideline provides:

§ 2H1.2. *Conspiracy to Interfere with Civil Rights*
 (a) Base Offense Level (Apply the greater):
 (1) 13; or
 (2) 2 plus the offense level application to any underlying offense.
 (b) Specific Offense Characteristic
 (1) If the defendant was a public official at the time of the offense, increase by 4 levels.

9. The guideline provides:

§ 2H1.3. *Use of Force or Threat of Force to Deny Benefits or Rights in Furtherance of Discrimination; Damage to Religious Real Property*
 (a) Base Offense Level (Apply the greatest):
 (1) 10, if no injury occurred; or
 (2) 15, if injury occurred; or

(3) 2 plus the offense level applicable to any underlying offense. (b) Specific Offense Characteristic
 (1) If the defendant was a public official at the time of the offense, increase by 4 levels.

10. The relevant part of this guideline provides:

§ 2K1.4 *Arson; Property Damage By Use of Explosives*
 (a) Base Offense Level: 6
 (b) Specific Offense Characteristics
 . . . .
 (4) If the defendant used fire or an explosive to commit another offense that is a felony under federal law, or carried explosives during the commission of any offense that is a felony under federal law (*i.e.,* the defendant is convicted under 18 U.S.C. § 488(h)), increase by 7 levels.

the victim to the criminal conduct. Each concerns a different policy reason for enhancing the sentence.

 There was ample testimony to substantiate the court's finding that a black family in a predominantly Caucasian neighborhood is particularly susceptible to a burning cross in the night in their front yard and that the defendant knew or should have known of this particular susceptibility.

There was particularly poignant evidence in the trial testimony and the presentence report that the Heisser family was "particularly susceptible to the criminal conduct." The trial testimony and presentence report revealed the following reaction to the burning cross. At about 4:30 a.m., the Heisser daughter was awakened by noise and an orange glow from outside her bedroom window. Peering outside the window, she saw a flaming cross on the family front lawn. She woke up her brother and told him to wake up the parents. After the mother saw the burning cross, she was crying on her knees in the living room. Upon seeing the cross, the mother felt feelings of frustration and intimidation and feared for her husband's life. She testified what the burning cross symbolized to her as a black American: "Nothing good. Murder, hanging, rape, lynching. Just anything bad that you can name. It's the worst thing that could happen to a person." The presentence report, also noted that "the victim family is extremely traumatized" by the cross burning incident. Mr. Heisser told the probation officer that at the time of the occurrence, if the family did not leave, he believed someone would return to commit murder. Mr. Heisser "stated that he felt at the time that his 'home and women' had been violated and he was powerless to take action against the unknown perpetrator." Seven months after the incident, the family still lived in fear. Mr. Heisser still awakened at night to investigate any noises. Mrs. Heisser was prescribed medication to deal with the incident and could not afford a psychologist which her doctor had recommended. She was often reduced to tears in discussing the incident and is afraid when she stays home alone.

This is a reaction reasonably to be anticipated from this criminal conduct. Skillman knew or should have known that a black family, such as the Heisser family, would be terrified and particularly susceptible to this criminal conduct. The district court did not commit clear error in its section 3A1.1 determination.

## VIII. SENTENCING GUIDELINES: ACCEPTANCE OF RESPONSIBILITY

 The Government cross-appeals the district court's *sua sponte* finding that Skillman was entitled to a two-level reduction for accepting responsibility under U.S.S.G. § 3E1.1(a), at 3.23 (Nov. 1989). Section 3E1.1(a) permits this reduction "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." *See also* U.S.S.G. § 3E1.1 comment (n. 2), at 3.23 (Nov. 1989) (noting objective that "defendant ... manifest sincere contrition"). The district court did not purport to find that Skillman actually accepted responsibility. Rather, the court held that those who exercise their Fifth Amendment right to remain silent at trial must automatically receive credit for accepting responsibility in order to preserve that Guideline's constitutionality. We disagree.

The intent of the Guidelines is to give credit to the defendant who manifests sincere contrition. Merely pleading guilty to a crime does not necessarily constitute the contrition required for the reduction. In U.S.S.G. § 3E1.1(c), the sincere contrition must otherwise be evidenced. At the same time, a defendant who asserts his Fifth Amendment rights at trial and is found guilty is not precluded from establishing entitlement to the reduction. U.S.S.G. § 3E1.1(b).

While Skillman exercised his right to remain silent at trial, this did not disable him from accepting responsibility for his actions afterwards. Yet even after the jury found him guilty, Skillman refused to discuss his case with his probation officer, and

insisted that he did not intimidate or harrass anyone because of race. He declined to make any statement at his sentencing hearing. Therefore, there was no indication of contrition on the part of Skillman before or after he was convicted. In these circumstances, the district judge's holding that Skillman is entitled to the reduction is not supported by any evidence. It would be a strange result if the mere assertion of a Fifth Amendment right to remain silent would be a guarantee that such silence would result in receiving a more lenient sentence. This was not the intent of the Guidelines and is not required by the Constitution. In the absence of any indicia of contrition, we conclude that the district court's finding was clearly erroneous.[11]

Because a 37-month sentence is within the guideline range whether the panel affirms or reverses the district court's acceptance of responsibility finding, Skillman argues it is unnecessary to resolve the Government's cross-appeal.[12] Skillman relies on *United States v. Turner*, 881 F.2d 684, 688-89 (9th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 199, 107 L.Ed.2d 153 (1989). *See also United States v. Munster-Ramirez*, 888 F.2d 1267, 1273 (9th Cir.1989) (applying *Turner*), *cert. denied*, —— U.S. ——, 110 S.Ct. 1951, 109 L.Ed.2d 313 (1990). *Turner*, 881 F.2d at 688, held that: "In a situation where the trial judge would have pronounced the same sentence whether a dispute as to the appropriate guideline range was resolved in favor of the defendant or the government, a determination of which precise guideline range is applicable is unnecessary because the defendant cannot demonstrate prejudice." In *Turner*, it was clear that the district court would have imposed the same sentence regardless of

which way the contention would have been resolved.

The Government argues that although 37 months falls within the guideline range, Skillman might receive a higher sentence when the reduction for acceptance of responsibility is eliminated. Here, the district court noted "[t]his is clearly a general deterrence case" and, therefore, concluded the sentence would be "at the top of the guidelines."

We conclude the section 3E1.1 finding was incorrectly applied and it is unclear whether the district court would have given the same sentence. Therefore, remand is warranted, pursuant to 18 U.S.C. § 3742(f)(1) (1988), to consider Skillman's sentence without any section 3E1.1 adjustment.

The CONVICTION is AFFIRMED and the SENTENCE is AFFIRMED IN PART and REMANDED IN PART.

---

11. This case is distinguishable from *United States v. Watt*, 910 F.2d 587 (9th Cir.1990), where we held that "a sentencing court cannot consider *against* a defendant any constitutionally protected conduct." *Id.*, at 592 (emphasis in original). Skillman was not penalized for exercising his constitutional rights. Instead, Skillman received a benefit for asserting his Fifth Amendment rights. In the absence of any indicia of manifest sincere contrition, Skillman was not entitled to the two-level reduction under section 3E1.1.

12. The parties agree that the acceptance of responsibility finding gives Skillman an offense level of 17 and criminal history category III, entitling him to a guideline range of 30 to 37 months. Without the acceptance of responsibility finding, Skillman has an offense level of 19 and criminal history category III, providing him a guideline range of 37 to 46 months. *See* U.S.S.G. Ch. 5, Pt. A, at 5.2 (Nov. 1989) (sentencing table).