**UNITED STATES of America, Plaintiff–Appellee–Cross–Appellant,**

v.

**Gary Dean McINNIS, Defendant–Appellant–Cross–Appellee.**

Nos. 90–50693, 91–50035.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 8, 1992.

Decided Sept. 28, 1992.

**1228**

Dennis J. Dimsye, Leslie A. Simon, U.S. Dept. of Justice, Washington, D.C., John R. Dunne, Asst. Atty. Gen., Paul L. Seave, Elana S. Artson, Asst. U.S. Attys., Santa Ana, Cal., for plaintiff-appellee–cross-appellant.

G. David Haigh, Brastman & Haigh, Santa Ana, Cal., for defendant-appellant-cross-appellee.

Before: BROWNING and FARRIS, Circuit Judges, and GEORGE,* Chief District Judge.

GEORGE, Chief District Judge:

Defendant–Appellant Gary Dean McInnis ("McInnis") was convicted by a jury for the use of force to interfere with housing rights on account of race in violation of 42 U.S.C. § 3631(a) (1988) (Count 1) and for the use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (1988) (Count 2). The district court sentenced McInnis to twenty-four (24) months imprisonment on Count One and sixty (60) months imprisonment on Count Two. On appeal McInnis challenges the sufficiency of the evidence to support his conviction and whether certain evidence was properly admitted at trial. On cross-appeal, the Government challenges the district court's application of the federal Sentencing Guidelines in calculating McInnis' sentence on the civil rights charge. We affirm the conviction and remand on the Government's cross-appeal.

I.

The evidence presented at trial showed the following: McInnis is a resident of Hesperia, California. His residence is located directly north of a residence occupied by the Kellers, an African–American family. The homes are about three-fourths of a mile apart, separated by a vacant lot. On the evening of January 26, 1990, McInnis fired two shots from an 8 mm. Mauser rifle through the Kellers' home.[1] One of the bullets penetrated two walls of the house, and a portion of the bullet struck Olthea Keller in the stomach. Approximately

---

* Honorable Lloyd D. George, Chief United States District Judge, District of Nevada, sitting by designation.

1. Although he did at trial, for purposes of this appeal McInnis does not dispute that he is the party who fired the gun into the Kellers' home.

three weeks later, she underwent surgery to have the bullet fragments removed.

On the day of the shooting, Raymond Dybsand visited McInnis at his home for the purpose of obtaining automobile parts. McInnis apparently had a workshop in his garage and was known as a good source for parts. Dybsand had been to McInnis' house six or eight times before for the same purpose. On some of those occasions, McInnis had commented to Dybsand that he did not care to be around "niggers." Dybsand spent approximately three to four hours with McInnis. During that time, he and McInnis drank beer, talked, and searched through boxes for auto parts. At some point in the conversation, McInnis stated that he did not care for "niggers." McInnis pointed to the south and told Dybsand that "niggers" lived there. Less than 15 minutes later, McInnis picked up a rifle and a box of ammunition, left the garage and turned toward the Kellers' house. Dybsand then heard two gunshots. Mark Gibson, the Keller's next-door neighbor to the south, also heard gunshots coming from the north of the Kellers' house. After the last shot, he heard a middle-aged man yell "All niggers must die!" from the direction of McInnis' house.

Senior Deputy Bart Belknap and Reserve Deputy David Foster of the San Bernardino County Sheriff's Department arrived at the Keller residence approximately four minutes after the shooting. As they approached, Deputy Foster, who was in the passenger seat, noticed McInnis standing in front of his house screaming. After the squad car pulled into the Kellers' driveway, McInnis looked toward the deputies and shouted, "Hey, fuck them, they're only niggers. Hey, come and get me." Approximately 15 minutes after the shooting, Sergeant John Gocke of the San Bernardino County Sheriff's Department arrived on the scene. McInnis, his family and Mr. Dybsand were all outside in front of the house. As Sgt. Gocke was conferring with other officers, he heard McInnis say, "Fuck those niggers." Shortly thereafter, McInnis made a second comment about "niggers."

McInnis became particularly disruptive, yelling, moving his arms about wildly, and moving aggressively towards one of the deputies. Sgt. Gocke eventually arrested McInnis for interfering with the officers during the course of an investigation and for public intoxication. Police officers Gocke, Foster, and Belknap all testified at trial that McInnis had apparently been drinking. Defense witnesses also testified that McInnis was intoxicated on the day of the shooting.

Later on the evening of the shooting, Detective Paula Rago of the San Bernardino County Sheriff's Department obtained consent from McInnis' wife to search McInnis' house and garage. During the search, Detective Rago found in the garage and seized an 8 mm. Mauser rifle, as well as the following:

1. a wooden sign bearing the words "All Niggers Will Be Executed";

2. a Ku Klux Klan poster (picture of a white-hooded person with a flag in the background);

3. a black "Mr. T" doll hanging from the ceiling by a chain and noose;

4. a small black figure with a noose around its neck;

5. a small monkey with a noose around its neck;

6. a lamp bearing two lightning bolts and the initials "S.W.P.";

7. a flashlight imprinted with a swastika, two lightning bolts, and McInnis' nickname, "Red Eye";

8. a wooden plaque with a swastika painted on it;

9. a red cloth (presumably an armband) with a swastika on it;

10. a small poster bearing a swastika, with the words "Niggers Get Out! Go Back To Your Slums!" printed underneath.

In the master bedroom, Detective Rago found a machete with a 15–inch blade inside a canvas sheath with the words "Nigger Sticker" and "Get Out Go Back To Your Slums" on it. Several weeks after the shooting, pursuant to a search warrant, Special Agent Robert Cross of the FBI

found a green metal box containing ammunition in McInnis' garage. Pasted on the box was a sticker bearing a swastika and the statement "Who Needs Niggers."

At trial a ballistics expert explained the steps required to fire a round from an 8 mm. Mauser rifle: the bolt is first pulled backward, a cartridge is dropped into the chamber, the bolt is pushed forward, and the gun is fired. To fire a second round, the spent casing must first be ejected by lifting and moving the bolt backward. A second round can then be loaded and fired.

## II.

■ McInnis challenges the sufficiency of the evidence to sustain his conviction on the charge of use of force to interfere with housing rights on account of race, maintaining that the evidence at trial was insufficient to establish that he had the requisite intent necessary for a violation of the statute. In reviewing the sufficiency of the evidence, the court must determine whether, assessing the evidence in the light most favorable to the Government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Aceves–Rosales*, 832 F.2d 1155, 1157 (9th Cir.1987), *cert. denied*, 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988).

■ To establish a violation of 42 U.S.C. § 3631(a), the Government must prove beyond a reasonable doubt that the defendant acted with the specific intent to injure, intimidate or interfere with the victim because of her race and because of the victim's occupation of her home. *See United States v. Skillman*, 922 F.2d 1370, 1373 (9th Cir.1990), *cert. dismissed*, ── U.S. ──, 112 S.Ct. 353, 116 L.Ed.2d 275 (1991); *United States v. Wood*, 780 F.2d 955, 961–62 (11th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2920, 91 L.Ed.2d 549 (1986). Voluntary intoxication may be a defense to a specific intent crime. *United States v. Sneezer*, 900 F.2d 177, 179 (9th Cir.1990).

■ Viewing the evidence in the light most favorable to the Government, we find the evidence sufficient to support the conclusion that McInnis acted with the requisite intent, despite his apparent intoxication at the time of the shooting. McInnis' statements both before and after the shooting support the jury's finding that he acted with the necessary intent. McInnis made racially derogatory remarks to Raymond Dybsand and gestured toward Mrs. Keller's home within fifteen minutes of picking up his rifle, walking outside and firing on the house. When he gestured toward the house he stated, "Niggers live there," which supports the inference that he shot at the house because he disliked having African–Americans as neighbors. Immediately after hearing the sound of gunshots, the neighbor, Mark Gibson, heard a man yell "All niggers must die!" When police arrived on the scene approximately four minutes after the shooting, Deputy Foster saw McInnis look toward his police car and yell, "Hey, fuck them, they're only niggers. Hey, come and get me." These comments strongly support the finding that McInnis was aware of his acts and that those acts were motivated by racial hatred.

The items seized from McInnis' house and admitted at trial also support the conclusion that McInnis acted with the intent to interfere with Mrs. Keller's housing rights because of her race. Much of the evidence, including the sign reading "All Niggers Will Be Executed," the dolls with nooses around their necks, and the machete in the sheath reading "Nigger Sticker," demonstrate a clear hatred and violent attitude toward African–Americans. Such evidence indicates that McInnis acted with racial motivations. Additionally, one of the signs and the machete sheath stated "Niggers Get Out! Go Back To Your Slums." These items support a finding, not only that McInnis acted based on the Kellers' race, but also that he intended to interfere with their occupancy of their home. *See Skillman*, 922 F.2d at 1374 ("skinhead evi-

dence" tended to establish racial animus and that defendant might act on his beliefs).

■ The jury could also have reasonably concluded that McInnis was not too intoxicated at the time of the shooting to form the requisite intent based on the deliberate steps he engaged in to perform the shooting. He picked up his rifle in the garage, walked outside, moved about 100 feet along the fence at the south end of his property, loaded the rifle and fired at the Kellers' house. He then ejected the spent casing, loaded a second shell, and fired again. Taking all these facts in the light most favorable to the Government, we find that a reasonable jury could have found that McInnis was capable of forming the requisite intent for a violation of 42 U.S.C. § 3631(a), that he did in fact form that intent, and that he acted upon it.

### III.

■ Although McInnis filed a motion *in limine* prior to trial to exclude all the items seized from his residence on the grounds of undue prejudice under Federal Rule of Evidence 403, on appeal he is challenging the admission of only four of the items, all of which bear swastikas. Those items are (1) the poster with the swastika and the words "Niggers Get Out! Go Back To Your Slums!" printed underneath; (2) the flashlight imprinted with a swastika, two lightning bolts, and McInnis' nickname, "Red Eye"; (3) the wooden plaque with a swastika painted on it; and (4) the red

armband with a swastika on it.[2] Ordinarily, whether the district court properly admitted evidence under the Rule 403 balancing test is reviewed for abuse of discretion. *Skillman*, 922 F.2d at 1373. Even if admission was an abuse of discretion, however, a defendant must also establish that the evidentiary ruling constituted more than harmless error; that is, that it affected the defendant's substantial rights. *Id.*[3]

■ The critical question in Rule 403 balancing is "whether the probative value of relevant evidence was 'substantially outweighed by the danger of unfair prejudice' or was 'needless presentation of cumulative evidence.'" *Skillman*, 922 F.2d at 1374. "Unfair prejudice" occurs when the evidence has "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id.* (quoting Fed.R.Evid. 403 advisory committee's note). McInnis contends that introduction of the items bearing swastikas was unfairly prejudicial because swastikas evoke images of the atrocities committed by the Nazi's during World War II and that this prejudice substantially outweighs the probative value of the evidence.

This court recently rejected an argument very similar to McInnis' in *Skillman*. In that case, involving the burning of a cross in the yard of an African–American family, the lower court admitted over the defendant's objection evidence referring to "skinheads." Although the defendant was not a member of the skinheads, a witness testified that the defendant had asked her if he could attend a skinhead picnic (he was

---

**2.** Defendant apparently does not challenge the admissibility of the box of ammunition, seized from his garage, on which is pasted a sticker of a swastika and the words "Who Needs Niggers?"

**3.** It appears that McInnis did not properly preserve his objections for appeal as to two of the four challenged items. Before trial, McInnis filed a motion *in limine* to preclude the introduction of all the items seized from his garage as unfairly prejudicial. The district court denied the motion but stated that McInnis could renew it at trial if the evidence became cumulative. At trial, McInnis objected to the introduction of the plaque and the flashlight, but not the armband and the poster. When a defendant does not object to the introduction of evidence

at trial on the same grounds as raised on appeal, the district court will only be reversed for plain error. *See United States v. Morris*, 827 F.2d 1348, 1350 (9th Cir.1987), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988). Plain error is "'a highly prejudicial error affecting substantial rights.'" *Id.* (quoting *United States v. Sherman*, 821 F.2d 1337, 1339 (9th Cir.1987)) (further citations omitted). Thus, although the admissibility of the flashlight and the plaque are subject to review under the "abuse of discretion" standard and the admissibility of the armband and the poster are subject to review under the "plain error" standard, McInnis must show that admission affected his substantial rights in either case.

refused) and that the defendant had stated that he blamed the skinheads for the cross-burning in order to avoid going to jail. *Id.* at 1374 & n. 4. An FBI agent described the skinheads as "a neo-Nazi type of group ... [who] espouse racial purity and white power, and ... tend to be violent." *Id.* at 1374 n. 4. The court held that the admission of this evidence was not unfairly prejudicial because it tended to establish racial animus, an element of the crime, and it demonstrated that the defendant might act on his racial beliefs. *Id.* at 1374.

The defendant in *Skillman* also claimed that the testimony regarding skinheads was cumulative because the jury had other evidence before it demonstrating the defendant's racial hatred.[4] The court held that despite this other evidence of racial hostility, the evidence relating to skinheads "was not 'needless[ly]' cumulative in light of the difficulty in establishing the requisite racial animus and Skillman's theory-of-defense that he was a mere passive bystander at the crime." *Id.*

Like the "skinhead evidence" in *Skillman,* the four pieces of evidence that McInnis contends were improperly introduced at trial are clearly relevant to establishing his racial hatred and that he acted on that hatred, an element of the crime charged. Additionally, although McInnis does not dispute on appeal that he was the person who fired the shots, he argued at trial that it was Raymond Dybsand who had done so. He also argued that even if he (McInnis) did fire the shots, he was too intoxicated to form the requisite intent. The disputed "swastika evidence" was highly probative of identity, in that it tend-

ed to show that McInnis had a motive for the shooting (his racial hatred) while Dybsand did not. The poster with the swastika and the words "Niggers Get Out! Go Back To Your Slums!" is also probative to show that McInnis had the intent to interfere with the victim's housing rights.

■ In this case, as in *Skillman,* the probative value of the evidence was not "substantially outweighed" by the danger of unfair prejudice or needless presentation of cumulative evidence, in light of its value in establishing the necessary racial animus and in identifying McInnis as the shooter. Moreover, admission of this evidence did not affect McInnis' substantial rights. The other items seized from the garage and the other evidence presented at trial overwhelmingly establish that McInnis committed the shooting and did so with the requisite intent. It is unlikely that the evidence containing swastikas affected the outcome of the case or the defendant's right to a fair trial. *See Morris,* 827 F.2d at 1351; *United States v. Houser,* 804 F.2d 565, 570 (9th Cir.1986).

## IV.

■ The Government cross-appeals the district court's calculation of the offense level and concomitant sentence on the civil rights violation, contending that the court incorrectly applied the federal Sentencing Guidelines in determining the appropriate base offense level for the crime.[5] The Government argued at sentencing that the offense level for the civil rights charge should have been 21, with a corresponding

---

4. That evidence included a paper dart board of a black man running away entitled "Official Runnin' Nigger Target"; a paper bag with a swastika, the defendant's initials and the words "White Power"; testimony from a friend of the defendant's that the defendant drew swastikas and the words "white power," had a "White Pride" tattoo on his arm, and made statements such as "kill the nigger"; testimony from the defendant's girlfriend's father that the defendant said he was tired of a "nigger" family in the neighborhood and would burn a cross in their yard; and a poem containing racial epithets, found in the defendant's wallet at the time of his arrest. *Id.* at 1372.

5. The Government has moved this court for an order granting leave to file a portion of the Government's Excerpt of Record under seal. The motion specifically refers to the Government's written objections to the Presentence Report which were originally filed under seal in the district court pursuant to the local rules of the Central District of California and apparently have not been unsealed. McInnis has not filed an objection to the Government's motion. We conclude that this portion of the Excerpt of Record should be filed and kept under seal for so long as it remains under seal in the district court.

Guideline incarceration range of 41 to 51 months, based on the underlying offense of aggravated assault. The district court rejected the Government's position, stating that it believed the offense in question was not "akin to a tort of assault with a deadly weapon." The court also expressed concern that application of the aggravated assault guideline would double count McInnis' use of a firearm because McInnis had been separately convicted and would be separately sentenced for violating 18 U.S.C. § 924(c). The district court thus applied an offense level of 15 on the civil rights charge and sentenced McInnis to 24 months imprisonment, based on a Guideline imprisonment range of 21 to 27 months. The court also sentenced McInnis to 60 months on the gun charge, to run consecutively as required by statute. *See* 18 U.S.C. § 924(c)(1). The district court's construction and interpretation of the Sentencing Guidelines is reviewed *de novo*. *United States v. Carvajal*, 905 F.2d 1292, 1294–95 (9th Cir.1990).

▮ We find that the district court's concerns were misplaced and that it incorrectly calculated the base offense level for the civil rights charge. The offense level for a violation of 42 U.S.C. § 3631(a) is to be determined under U.S.S.G. § 2H1.3, which provides in pertinent part:

(a) Base Offense Level (Apply the greatest):

(1) 10, if no injury occurred; or

(2) 15, if injury occurred; or

(3) 2 plus the offense level applicable to any underlying offense.

The guideline thus sets a minimum base offense level of 15 where a defendant's actions result in any degree of injury. U.S.S.G. § 2H1.3(a)(2). However, the

guideline further provides that the sentencing court is to use the offense level applicable to the defendant's underlying criminal conduct if 2 plus that offense level is greater that 15. Accordingly, the correct procedure for determining the base offense level under § 2H1.3(a) is for the sentencing court to first determine what underlying offense defendant's conduct constitutes and what offense level under the Guidelines is most applicable to the underlying offense. The court should then add 2 points to that offense level pursuant to U.S.S.G. § 2H1.3(a)(3).[6] If the resulting offense level is greater than 15, the sentencing range should be based on that higher offense level. *See Byrd*, 954 F.2d at 589. In this case, the district court failed to follow this procedure and therefore applied the Guidelines incorrectly.

The term "2 plus the offense level applicable to any underlying offense" is defined as 2 levels above the offense level (base offense level plus any applicable specific offense characteristics) from the guideline in Chapter Two that most closely corresponds to the underlying criminal offense. U.S.S.G. § 2H1.1, comment. (n. 1). Thus, consideration of a defendant's underlying offense does not require that the defendant actually have been convicted of or charged with any other crime. Rather, the sentencing court is to determine the offense level of the offense most comparable to the defendant's conduct.

▮ In the instant case, McInnis' conduct was an assault, most closely akin to the offense of assault resulting in serious bodily injury under 18 U.S.C. § 113(f).[7] Under federal law, assault resulting in serious bodily injury is a general intent crime which does not require proof of specific intent to injure the victim. *United States*

6. The Guidelines provide for the 2–point enhancement because the harm involved in civil rights offenses "stems both from the underlying conduct itself and the fact the underlying conduct is intended to deprive a person of federally protected rights." *United States v. Byrd*, 954 F.2d 586, 589 (9th Cir.1992) (per curiam); *see* U.S.S.G. § 2H1.3, comment. (n. 1); U.S.S.G. § 2H1.1, comment. (n. 1).

7. McInnis was not charged with violating 18 U.S.C. § 113(f) because his conduct did not occur "within the special maritime and territorial jurisdiction of the United States." However, "[o]nce jurisdiction is established over the offense of conviction, such jurisdictional requirements are irrelevant in computing a sentence." *Byrd*, 954 F.2d at 589.

*v. Fitzgerald,* 882 F.2d 397, 399 (9th Cir. 1989). The general intent requirement is satisfied by proof that a defendant committed a volitional act that he or she knew or reasonably should have known was wrongful. *United States v. Loera,* 923 F.2d 725, 730 (9th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991). A defendant is presumed to have intended the natural and probable consequences of his or her acts. *Id.* Thus, to have committed an assault within the meaning of the federal statute, McInnis need not have intended to injure Olthea Keller or anyone else when he fired his rifle at the Keller residence. His conduct constituted assault within the meaning of § 113(f) if he fired the rifle voluntarily, with a reckless disregard for the possibility of injury to others. *See id.,* at 728 (affirming conviction under 18 U.S.C. § 113(f) where voluntarily intoxicated defendant, driving recklessly, injured child); *United States v. Juvenile Male,* 930 F.2d 727, 728–29 (9th Cir.1991) (affirming conviction under 18 U.S.C. § 113(f) where defendant fired rifle to frighten one group of teenagers and unintentionally hit victim in separate, unseen group). In the case at bar, McInnis voluntarily shot the rifle into the Keller's home with a reckless disregard for the possibility that someone could be injured. Such conduct constitutes assault resulting in serious bodily injury within the meaning of § 113(f).

The Guideline applicable to this most comparable offense is U.S.S.G. § 2A2.2, aggravated assault. An "aggravated assault" is defined as, among other things, "a felonious assault that involved ... serious bodily injury." U.S.S.G. § 2A2.2, comment. (n. 1(b)). As discussed above, McInnis' conduct did constitute a felonious assault and serious bodily injury clearly occurred.[8] The sentencing court, therefore, should have determined the offense level

for the underlying offense of aggravated assault under § 2A2.2, and if 2 plus that offense level was larger than 15, the court should have applied the greater in determining McInnis' sentencing range. The base offense level for aggravated assault is 15, U.S.S.G. § 2A2.2(a), and since in this case the victim suffered serious bodily injury, the base offense level should be increased by 4, to 19. U.S.S.G. § 2A2.2(b)(3)(B). Under § 2H1.3(a)(3), an additional 2 points are added, for a total base offense level of 21. Since 21 is greater than 15, the higher offense level of 21 and the corresponding incarceration range should have been applied at sentencing.

The district court declined to look at the underlying offense as argued by the Government at sentencing because it believed that McInnis' conduct was not "akin to the tort of assault with a deadly weapon." This statement reflects a misunderstanding of the Government's argument and of the appropriate procedure to be followed in applying § 2H1.3 of the Guidelines. McInnis' underlying offense was akin to the *criminal* offense of assault resulting in serious bodily injury in violation of 18 U.S.C. § 113(f). Principles of tort law are irrelevant to the determination of the underlying comparable offense for purposes of applying § 2H1.3.

■ Additionally, application of the underlying offense of aggravated assault does not double-count the fact that McInnis used a rifle, even though he was also convicted and sentenced for violating 18 U.S.C. § 924(c) for using a firearm during a crime of violence. The background commentary to U.S.S.G. § 2K2.4, the guideline corresponding to § 924(c), specifically provides that to avoid double-counting, if a defendant is sentenced under § 2K2.4 and is also sentenced for an underlying offense, any enhancements for firearm use should not be applied with respect to the underlying offense. Accordingly, the district court's

---

**8.** The Guidelines define "seriously bodily injury" as "injury involving extreme physical pain or ... requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, comment. (n. 1(j)). Olthea

Keller, the victim, was hospitalized after the shooting and subsequently underwent surgery to remove the bullet fragments. She clearly suffered bodily injury within the Guidelines' definition.

concern about double counting is fully addressed by the Guidelines. The court should have applied the aggravated assault guideline, § 2A2.2(b)(3)(B), but should not have added 5 levels for the specific offense characteristic of discharging a firearm as provided for under the guideline. *See* § 2A2.2(b)(2).

We conclude that the district court's refusal to consider the underlying offense of assault resulting in serious bodily injury in its calculation of the appropriate offense level under § 2H1.3 of the Sentencing Guidelines was in error. Accordingly, we remand for resentencing on the civil rights violation in a manner consistent with this opinion.

The CONVICTION is AFFIRMED and the case is REMANDED for resentencing.