**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 11 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JAMES WHITNEY,

Defendant-Appellant.

No. 99-3285

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 99-20010-01)**

---

Jenine Jensen, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant-Appellant.

Lisa J. Stark, Department of Justice (Bill Lann Lee, Acting Assistant Attorney General, Jessica Dunsay Silver, with her on the brief), Washington, D.C., for Plaintiff-Appellee.

---

Before **SEYMOUR** , Chief Judge, **HENRY** , and **MURPHY** , Circuit Judges.

---

**HENRY** , Circuit Judge.

---

James Whitney was convicted of interfering with federal housing rights on the basis of race, in violation of 42 U.S.C. § 3631(a), and conspiracy to interfere with those federal rights, in violation of 18 U.S.C. § 241. On appeal, Mr. Whitney argues: (1) the evidence was insufficient to sustain both convictions; (2) the district court committed plain error by allowing the co-defendants and one co-defendant's wife to testify that the co-defendants had pleaded guilty to the conspiracy charge; and (3) the court committed plain error by increasing his criminal history level by one point for a prior conviction of "Minor In Possession." For the reasons set forth below, we affirm Mr. Whitney's convictions and sentence.

## I. BACKGROUND

In July 1998, Mr. Whitney and three or four others gathered at the home of Mr. Whitney's brother, Anthony. An African-American teenager, Kenneth Green, passed by on the sidewalk, and the men began yelling racial epithets at him. Mr. Green returned a few hours later and knocked on the door to Anthony's house. Mr. Whitney answered the door, and Mr. Green punched him in the face, leaving him with a black eye.

A week later, Mr. Whitney, Anthony, Raymond Roland, and Paul Geiger were gathered at Anthony's house. The men were drinking heavily and discussing

the prior incident with Mr. Green. Mr. Green lived in the neighborhood, just down the street from Anthony with an African-American family named the Madkins. At some point during this gathering, the idea arose to burn a cross in the Madkins' yard.

Following the discussion, Anthony, Mr. Roland, and Mr. Geiger proceeded to Anthony's garage and nailed two boards together to form a cross. Mr. Whitney passed in and out of the garage but did not aid in building the cross. Anthony and Mr. Roland then carried the cross down the street toward the Madkins' home. However, there were people outside, so they left the cross in an alley and returned to Anthony's home.

Next, all four men decided to drive to the fairgrounds to watch a demolition derby. Shortly after they arrived, they changed their minds, bought more alcohol, and drove back to Anthony's house. When they arrived back at Anthony's, Mr. Whitney stayed in the house while Anthony, Mr. Roland, and Mr. Geiger retrieved the cross and a gas can. Mr. Geiger watched as Mr. Roland and Anthony stuck the cross in the Madkins' front yard and lit it on fire. The men ran back to the house and informed Mr. Whitney they had burned the cross in the Madkins' yard. Mr. Roland described Mr. Whitney's reaction as, "Just, okay. Cool, it's done." Supp. Rec. vol 1 at 75.

Later, Mr. Whitney told investigators he was not aware of the cross burning until the following day, when his landlady informed him. However, eventually, Mr. Roland, at the urging of his wife, confessed to the Kansas City Fire Department and gave a statement regarding everything he knew about the incident. The statement implicated all four men. The government charged Mr. Roland, Mr. Whitney, and Anthony Whitney in a two-count indictment with violating 42 U.S.C. § 3631(a), interference with housing rights on the basis of race, and 18 U.S.C. § 241, conspiracy to interfere with federal rights. Mr. Roland and Anthony entered into plea agreements.

Mr. Whitney went to trial, and Mr. Roland and Anthony testified on behalf of the government pursuant to their plea agreements. A jury convicted Mr. Whitney on both counts. The district court sentenced him to twenty-one month terms of imprisonment on each count to run concurrently.

## II.    DISCUSSION

### A.    Sufficiency of the Evidence

Mr. Whitney asserts the evidence presented at trial was insufficient to sustain his convictions on both counts. We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government and inquiring whether any rational trier of fact could have found the defendant guilty

of the crime beyond a reasonable doubt.     See United States v. Wood  , 207 F.3d

1222, 1228 (10th Cir. 2000).     The defendant's hurdle after a jury verdict is high:

"[w]e will not overturn a jury's finding unless no reasonable juror could have

reached the disputed verdict."     United States v. Carter   , 130 F.3d 1432, 1439 (10th

Cir. 1997).


### 1.     Conviction under 18 U.S.C. § 241.

Section 241 of the Civil Rights Act of 1866 and 1870 states:

> If two or more persons conspire to injure, oppress, threaten, or
> intimidate any person . . . in the free exercise or enjoyment of any right
> or privilege secured to him by the Constitution or laws of the United
> States, or because of his having so exercised the same; . . .
>
> They shall be fined under this title or imprisoned not more than ten
> years, or both; . . .

18 U.S.C. § 241 (1999).

To obtain a conviction for conspiracy under § 241, the government must

prove that the defendant (1) knowingly agreed with another, (2) to injure a person

in the exercise of any right guaranteed under the laws of the United States.     See

United States v. Epley   , 52 F.3d 571, 575-76 (6th Cir. 1995);     United States v.

Reese , 2 F.3d 870, 880 (9th Cir. 1993).   The right at issue in this case is set forth

in 42 U.S.C. § 3631(a):  the right to housing free from intimidation or

interference on the basis of race.

Section 241 does not require proof of an overt act in furtherance of the conspiracy.   See United States v. Crochiere  , 129 F.3d 233, 237-38 (1st Cir. 1997) (stating that "[t]he Supreme Court case of     United States v. Shabani  , 513 U.S. 10 (1994) . . . requires a holding that § 241 contains no overt act requirement") ;      see also United States v. Skillman  , 922 F.2d 1370, 1375 (9th Cir. 1991) (stating that § 241 does not require proof of an overt act in furtherance of the conspiracy); United States v. Morado  , 454 F.2d 167, 169 (5th Cir.1972);    cf. Shabani , 513 U.S. at 14-15 (noting, in its holding that the federal drug conspiracy statute, 21 U.S.C. § 846, does not require an overt act, that the language of the statute does not require an overt act, and that the Court has not inferred such a requirement from congressional silence in other conspiracy statutes).

Here, Mr. Whitney does not challenge the existence of a conspiracy to interfere with the Madkins' exercise of federal rights by burning a cross in their front yard.   See Aplt's Br. at 17 (conceding "the government proved that Raymond Roland and Anthony Whitney conspired to threaten the victims"). Rather, Mr. Whitney solely contends the government failed to "prove that he became a member of that conspiracy."     Id.

The government need not offer direct proof of an express agreement on the part of the defendant.   See United States v. Bell  , 154 F.3d 1205, 1208 (10th Cir. 1998).  Instead, the agreement may be informal and may be inferred entirely from

-6-

circumstantial evidence. See id. "[T]he defendant's participation in, or connection to, the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." United States v. Bowie, 892 F.2d 1494, 1497 (10th Cir. 1990) (citation and quotations omitted). Moreover, an agreement may be inferred from a variety of circumstances, such as, "sharing a common motive, presence in a situation where one could assume participants would not allow bystanders, repeated acts, mutual knowledge with joint action, and the giving out of misinformation to cover up [the illegal activity]." United States v. Davis, 810 F.2d 474, 477 (5th Cir. 1987) (citations omitted); see also United States v. Piche, 981 F.2d 706, 717 (4th Cir. 1992); United States v. Ellis, 595 F.2d 154, 160 (3d Cir. 1979).

Viewing the record in the light most favorable to the government, as we are required to do after a jury verdict, there was sufficient evidence to support the finding that Mr. Whitney agreed to burn the cross in the Madkins' yard. On the afternoon of the cross burning, Anthony, Mr. Roland and Mr. Geiger were gathered at Anthony's house. The men did not begin discussing Mr. Whitney's altercation with Mr. Green or the idea of burning a cross until after Mr. Whitney arrived. Referring to the encounter with Mr. Green, Mr. Whitney agreed with Mr. Roland's statement that, "[t]hat was a fucked up deal. He shouldn't have got away with that." Supp. Rec. vol. I at 74. Mr. Whitney added, "Yeah, it's pretty

-7-

fucked-up. I don't know why he did it." Id. Mr. Whitney also referred to the Madkins as "niggers." Id. vol. II at 141-42; cf. United States v. Pospisil, 186 F.3d 1023, 1028-29 (8th Cir. 1999) (holding evidence sufficient to support conviction of conspiracy to violate federal rights in violation of § 241 where the defendants involved in cross burning made racially derogatory statements), cert. denied, 120 S. Ct. 1724 (2000).

Further, evidence was presented that showed that not only did Mr. Whitney know about, discuss, and encourage the action, but that he initiated it. Anthony Whitney testified that he told the FBI that it was Mr. Whitney's idea initially to burn the cross. Supp. Rec. vol. II at 145, 186. Moreover, Mr. Roland testified that, although there was no verbal agreement, there was a "mutual understanding" of what they were going to do and that everyone "pretty much" agreed to go burn a cross. Id. at 118, 143; Supp. Rec. vol. I at 67. The men specifically discussed the fact that the Ku Klux Klan burned crosses in the yards of African Americans as a symbol of hatred and chose to burn a cross for this very reason.

According to Anthony, while he and Mr. Roland were building the cross in Anthony's garage, Mr. Whitney was in and out of the house and probably saw them building it. Although Mr. Whitney did not directly participate in the construction or burning of the cross, immediately after Anthony and Mr. Roland burned the cross in the Madkins' yard, they returned to Anthony's house and

informed Mr. Whitney of what they had done. Mr. Roland described Mr. Whitney's reaction as, "Just okay. Cool it's done." Supp. Rec. vol. I at 75. Finally, Mr. Whitney's credibility is suspect in that he told an investigator that he did not learn of the incident until he was informed by his landlady the day after it occurred, in conflict to the testimony of his co-conspirators.

Other courts have upheld conspiracy convictions under § 241 when the defendant did not directly participate in the cross burning. See, e.g. , United States v. Montgomery , 23 F.3d 1130, 1132-33 (7th Cir. 1994) (concluding evidence was sufficient to support conviction under 18 U.S.C. § 241 arising out of cross burning even though the defendant discussed building a cross to scare African-American residents out of the neighborhood, and vandalized a car while his co-defendants prepared the cross for burning); United States v. Gresser , 935 F.2d 96, 100-101 (6th Cir. 1991) (holding evidence was sufficient to support conviction under § 241 arising out of cross burning where defendant claimed his actions were directed towards particular African-American youths with whom he was involved in an altercation rather than African-Americans in general, and none of the witnesses were able to testify to knowledge of willful formation of conspiracy, to attribute any threatening statements to him, or to link him to the cross burning); Skillman , 922 F.2d at 1372-73 (concluding evidence was sufficient to establish "slight connection" necessary to support conspiracy

-9-

conviction under § 241 arising out of cross burning when evidence established the defendant transported a Valvoline container, was present during the cross burning, and blamed the cross burning on skinheads in order to avoid going to jail); United States v. White, 788 F.2d 390, 393 (6th Cir. 1986) (concluding evidence supported conviction of conspiracy in violation of § 241 where, although the defendant did not participate in the arson of an African-American home, he had made statements such as, "if that black son of a bitch [re]built . . . across the street from me . . . I'd burn it down"). Under our standard of review, the evidence in this case was sufficient for a jury to reasonably conclude that Mr. Whitney agreed to the cross burning and thus, that he agreed to interfere with the Madkins' federal rights in violation of § 241.

### 2. Conviction under 42 U.S.C. § 3631(a)

At trial, defense counsel moved for a judgment of acquittal on the charge of aiding and abetting a violation of § 3631(a), arguing there was no evidence that Mr. Whitney "did anything." Rec. vol. II at 228. The court denied the motion.

On appeal, Mr. Whitney contends the government did not prove he "did something to help or to encourage the crime with the intent that it be committed." Aplt's Br. at 25. He emphasizes that "[m]ere presence at the scene of the crime, even with knowledge that a crime is being committed is not enough." Id. (citing

United States v. Taylor, 612 F.2d 1272, 1275 (10th Cir. 1980)).  In support of his argument that the evidence of aiding and abetting was insufficient, he also points to the fact that the jury asked the court during deliberations to define "encouragement."  We are not persuaded by Mr. Whitney's arguments.

Section 3631 states in relevant part:

> Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with
> (a) any person because of his race [or] color . . . and because he is or has been . . . renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing, or occupation of any dwelling
> . . . .
>
> shall be fined under Title 18 or imprisoned not more than one year, or both; . . . [but] if such acts include the use, attempted use, or threatened use of . . . fire shall be fined under Title 18 or imprisoned not more than ten years, or both; . . .

42 U.S.C. § 3631(a) (1994 & 1999 Supp.).

"To establish a violation of 42 U.S.C. § 3631(a), the Government must prove beyond a reasonable doubt that the defendant acted with the specific intent to injure, intimidate or interfere with the victim because of her race and because of the victim's occupation of her home."  United States v. McInnis, 976 F.2d 1226, 1230 (9th Cir. 1992) (citing Skillman, 922 F.2d at 1373; United States v. Wood, 780 F.2d 955, 961-62 (11th Cir.1986)).

Mr. Whitney was charged with aiding and abetting a violation of § 3631(a).  Unlike the "non-overt act" conspiracy in 18 U.S.C. § 241, "[t]o be guilty of aiding

-11-

and abetting the commission of a crime, the defendant must willfully associate himself with the criminal venture and seek to make the venture succeed through some action of his own." United States v. Anderson, 189 F.3d 1201, 1207 (10th Cir. 1999). "Participation in the criminal venture may be established by circumstantial evidence and the level of participation may be of 'relatively slight moment.'" Id. (citing United States v. Leos-Quijada, 107 F.3d 786, 794 (10th Cir.1997)). Further, "[o]ne may become an accomplice . . . by words or gestures of encouragement, or by providing others with the plan for the crime." 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 6.7, at 138 (1986). "Conduct of the defendant or special circumstances may justify an inference that the defendant has associated himself with the criminal objective." Taylor, 612 F.2d at 1275.

Here, the government presented evidence that Mr. Whitney used racial epithets when referring to Mr. Green and the Madkins, and discussed cross burning as a symbol of hatred towards African-Americans on the afternoon prior to the crime. See McInnis, 976 F.2d at 1230 (concluding evidence was sufficient to support conviction of § 3136(a) when defendant had used racially derogatory remarks); see also United States v. Randolph, 93 F.3d 656, 654 (9th Cir. 1996) ("Central to [the] holding [in McInnis] were the racially derogatory remarks McInnis made before and after the shooting."), abrogated on other grounds by

-12-

Holloway v. United States, 526 U.S. 1 (1999). A juror could reasonably find these were "words or gestures of encouragement." LaFave & Scott, supra, at 138.

There was also testimony from one of the co-defendants, albeit disputed, that Mr. Whitney initiated the idea to burn the cross in the Madkins' yard. Confronted with this testimony, the jury reasonably could have inferred he "provid[ed] others with a plan for the crime." Id. Accordingly, there was sufficient evidence to support Mr. Whitney's conviction of aiding and abetting a violation of § 3631(a).

**B.      Testimony Regarding the Co-defendants' Guilty Pleas**

Mr. Whitney argues the court erred in allowing Mr. Roland and Anthony to testify that they pleaded guilty to the same conspiracy charge and not giving a cautionary instruction. Additionally, Mr. Whitney asserts the court further erred in allowing Joyce Whitney, Anthony's wife, to testify regarding Anthony's guilty plea.

"A codefendant's guilty plea may not be used as substantive evidence of a defendant's guilt." United States v. Baez, 703 F.2d 453, 455 (10th Cir.1983). However, either the government or the defense may elicit testimony from a co-defendant regarding his guilty plea for purposes of aiding the jury in its assessment of the co-defendant's credibility as a witness. See id. Further,

evidence of a co-defendant's guilty plea may be used to establish "the witness's claim to firsthand knowledge based on his or her admitted participation." United States v. Davis, 766 F.2d 1452, 1456 (10th Cir. 1985). These rules apply to guilty pleas of co-conspirators as well. See United States v. Austin, 786 F.2d 986, 991 (10th Cir. 1986). "Because of the potential for prejudice, cautionary instructions limiting the jury's use of the guilty plea to permissible purposes are critical." Baez, 703 F.2d at 455.

Mr. Whitney did not object to any of the testimony regarding the co-conspirators' guilty pleas of which he now complains. Nor did he request an instruction. Thus, we review for plain error. See Fed. R. Crim. P. 52(b); United States v. Osuna, 189 F.3d 1289, 1292 n.2 (10th Cir. 1999). "While the trial judge should specially instruct the jury about the permissible purposes to which such evidence may be used . . . we have never held that a trial court's failure to so instruct constitutes per se plain error." Davis, 766 F.2d at 1456. Rather,

> [i]n determining whether the failure to give a cautionary instruction results in plain error, we consider the following factors: (1) whether there was a proper purpose in introducing the guilty plea; (2) whether the guilty pleas were improperly emphasized or used as evidence of substantive guilt; (3) whether the alleged error was invited by defense counsel; (4) whether the failure to object could have been the result of tactical considerations; and (5) whether, in light of all of the evidence the error was harmless beyond a reasonable doubt.

United States v. Pedraza, 27 F.3d 1515, 1526 (10th Cir. 1994).

### 1.    Mr. Roland's Guilty Plea

The government argues that it elicited testimony from Mr. Roland regarding his guilty plea for the purpose of "inform[ing] the jury of the circumstances under which he was testifying and his knowledge of the offense." Aple's Br. at 25.  It is clear from the record that this was in fact the government's purpose, and such is a proper use of evidence of a co-defendant's guilty plea.    See Davis, 766 F.2d at 1456.  Further, although the prosecutor made one reference to the co-defendants' guilty pleas during the opening statement, the record does not reveal that Mr. Roland's guilty plea was improperly emphasized or ever used as substantive evidence of guilt.    See Government of Virgin Islands v. Mujahid    , 990 F.2d 111, 117-18 (3d Cir. 1993) (concluding that reference to co-defendant's guilty plea in prosecutor's opening statement and co-defendant's testimony on direct examination was not plain error, even though the court gave no cautionary instruction, because of the strength of other admissible evidence of defendant's guilt and lack of any intentional prosecutorial misconduct).

Moreover, although we cannot fairly assert defense counsel invited the error or failed to object for tactical considerations, he did extensively cross-examine Mr. Roland regarding the terms of his plea agreement, thereby benefitting from the guilty plea evidence.  That cross-examination weighs against a conclusion of plain error.    See Pedraza , 27 F.3d at 1526;    cf. United States v.

-15-

Leach, 918 F.2d 464, 467 (5th Cir. 1990) (stating that admission of a co-conspirator's guilty plea will not result in plain error where a defendant "instigates such admission, or attempts to exploit the evidence by frequent, pointed, and direct references to the coconspirators' guilty plea."). Finally, the evidence of Mr. Whitney's involvement in the conspiracy to burn the cross is strong enough so as not to leave us with the impression that admission of Mr. Roland's guilty plea affected Mr. Whitney's substantial rights or contributed to a miscarriage of justice. See Davis, 766 F.2d at 1456. Thus, admission of Mr. Roland's guilty plea was not plain error.

### 2. Anthony Whitney's Guilty Plea

During direct and redirect examination, the government elicited testimony from Anthony regarding his guilty plea. The government asserts the testimony was elicited on direct for the purpose of bolstering Anthony's credibility, and on redirect for the purpose of rehabilitating it.

First, we consider Anthony's testimony regarding his guilty plea during direct examination. Relying on Austin, 786 F.2d at 991-92, Mr. Whitney argues the government may elicit evidence of a co-conspirator witness's guilty plea to bolster credibility only after his or her credibility has been attacked. Thus, he suggests the government may never properly elicit evidence of co-conspirator's

guilty plea on direct examination for purposes of credibility assessment. We disagree that Austin can be interpreted as stating such a broad proposition.

In Austin, we noted that the government blatantly argued to the jury, in its opening and closing arguments and through the testimony of several of its witnesses, that the convictions of ten co-conspirators established substantive evidence of the defendant's guilt. The government had argued that it properly elicited evidence of the co-conspirator convictions from its primary witness on redirect for the purpose of rehabilitating his credibility. We rejected this argument because the government's alleged purpose of rehabilitation could not apply to the improper statements regarding the co-conspirator convictions made during opening argument or the elicitation of evidence of the same on direct examination, where "the need to rehabilitate [the witness] had not yet arisen." Id. at 992. We further noted that the government's rehabilitation argument failed in light of the fact that the government's primary witness testified as to the convictions of other co-conspirators which, under the facts of the case, did not bear on the witness's own credibility.

The case at hand is distinguishable on multiple grounds. First, Anthony testified regarding his own guilty plea, not the guilty pleas of other co-conspirators. Second, here the government argued that it elicited evidence of Anthony Whitney's guilty plea on direct examination for the purpose of

bolstering, not rehabilitating, his credibility. This is a proper purpose, even if the government chose to anticipate the need to bolster credibility by eliciting testimony regarding the guilty plea on direct examination. See, e.g. , Pedraza , 27 F.3d at 1525-26.

In Pedraza the government elicited testimony from two co-conspirators, on both direct and cross-examination, regarding their guilty pleas. See id. at 1525. We held the court did not commit plain error in failing to give a limiting instruction because "[t]he government's sole purpose in introducing the coconspirators' guilty pleas was the entirely permissible one of minimizing damage to the witnesses' credibility during their examination." Id. at 1526.

Additionally, many of our sister "circuits have consistently recognized that, under proper instruction, evidence of a guilty plea may be elicited by the prosecutor on direct examination so that the jury may assess the credibility of the witnesses the government asks them to believe." United States v. Halbert , 640 F.2d 1000, 1004 (9th Cir.1981); see, e.g. , United States v. Tse , 135 F.3d 200, 207 (5th Cir. 1998) ("[The co-defendant's] guilty plea was properly elicited on direct examination to counteract the anticipated attack on [the co-defendant witness'] credibility by [the defense]."); United States v. Davis , 838 F.2d 909, 918 (7th Cir. 1988) ("The government may properly bring out agreements to cooperate and the circumstances behind those agreements in order to blunt the impact of cross-

-18-

examination and to avoid the impression that the government was concealing the information."); United States v. Dworken, 855 F.2d 12, 30 (1st Cir.1988) (stating that a co-conspirator's guilty plea is properly "elicited to dampen the effect of an anticipated attack on the witness's credibility"); United States v. Christian, 786 F.2d 203, 214 (6th Cir. 1986) ("The prosecutor may also wish to place the plea before the jury so as to blunt defense efforts at impeachment and dispel the suggestion that the government or its witness has something to hide."); United States v. Whitehead, 618 F.2d 523, 529 (4th Cir. 1980) (concluding that prosecutorial questioning about a co-defendant/witness's guilty plea need not be limited to the scope of defendant's stated intended inquiry about the plea); United States v. Veltre, 591 F.2d 347, 349 (5th Cir. 1979) (stating that prosecutor's reference to co-defendant's guilty plea during opening statement was not error because "[w]here . . . the codefendant is a witness at trial, subject to the rigors of cross-examination, disclosure of the guilty plea to blunt the impact of attacks on her credibility serves a legitimate purpose and is permissible").

Further, the record indicates that the government's brief questioning of Anthony regarding his guilty plea during direct examination was limited to issues of bolstering credibility. Finally, because defense counsel had already cross-examined Mr. Roland regarding the terms of his plea agreement, he provided additional grounds for the government to disclose Anthony's guilty plea early in

his testimony. See United States v. Hernandez, 921 F.2d 1569, 1582-83 (11th Cir.1991) (concluding that failure to give cautionary instruction regarding guilty plea evidence was not error, in part, because "[t]he defense invited the testimony [on direct examination] . . . [by] cross-examin[ing] other witnesses at length on their grants of immunity, guilty pleas and sentences and eventually cross-examin[ing] [the co-defendant] about his plea").

Next, we address the government's elicitation of evidence of Anthony's guilty plea during redirect examination. In his Appellant Brief, at 28, Mr. Whitney quotes the following excerpt from Anthony's testimony on redirect:

> Q. Now when you pled guilty to this case, to these charges, you pled guilty to conspiracy to build and burn that cross in the Madkins' yard, right?
>
> A. Yes.
>
> Q. And you, when you pled guilty, you agreed that the two co-conspirators with you, one was Raymond Roland, right?
>
> A. Yes.
>
> Q. The other one was your brother?
>
> A. Yes.
>
> Q. And that is what you pled guilty to?
>
> A. Yes.
>
> Q. So when you pled guilty, you acknowledged your brother was involved in the conspiracy?

A. Yes.

Supp. Rec. vol. II at 184-84.

Reading this portion of the record alone, the government's questioning is somewhat troubling and suggests the government was using evidence of Anthony's guilty plea as substantive evidence of Mr. Whitney's guilt. This is because the prosecutor elicited from Anthony the fact that he pleaded guilty to conspiracy with Mr. Whitney , the crime with which Mr. Whitney was charged. Cf. United States v. Kroh , 915 F.2d 326, 331 (8th Cir. 1990) (holding that it was not an abuse of discretion to allow defendant's brother to testify as to his guilty plea in part because, during questioning, the prosecutor did not mention that the conspiracy to which the defendant's brother pleaded guilty was a conspiracy with the defendant).

However, as the government argues, and our review of Anthony's entire testimony supports, the prosecutor's motive was to rehabilitate Anthony's credibility after a vigorous cross-examination. On direct examination, Anthony testified that, in September, he told an FBI agent that it was Mr. Whitney's "idea initially . . . to burn the cross." Supp. Rec. vol. II at 145. On cross-examination, however, defense counsel elicited from Anthony that he subsequently told an agent that "someone suggested" that they burn a cross but that he did not disclose who made the suggestion because he was too drunk to remember. See id. at 178.

Further, Anthony admitted that in March he gave a deposition in which he testified that it was his idea to burn the cross.     See id. at 179.

In light of these inconsistencies in Anthony's testimony, it is clear that the government was trying to rehabilitate the credibility of his earlier statement that it was Mr. Whitney's idea to burn the cross by establishing that, at the time he pleaded guilty, he acknowledged Mr. Whitney's participation in the conspiracy. Thus, the testimony on redirect regarding Anthony's guilty plea was elicited for the proper purpose of rehabilitating his credibility.     See Davis, 766 F.2d at 1456.

As to the remaining factors regarding the government's use of Anthony's guilty plea, our conclusion is the same as with Mr. Roland's guilty plea.  Even though the prosecutor made one brief reference to it during the opening statement, considering the record as a whole, the government did not improperly emphasize Anthony's guilty plea.  Further, although the defense did not necessarily invite the error or fail to object for tactical reasons, it did cross-examine Anthony regarding the conditions of his plea agreement.  Finally, the evidence supporting Mr. Whitney's involvement in the conspiracy to burn the cross is sufficiently strong so as to warrant the conclusion that admission of his brother's guilty plea did not effect his substantial rights or contribute to a miscarriage of justice.     See Hernandez, 921 F.2d at 1582-83 (concluding that, despite the absence of a cautionary instruction, the district court did not abuse its discretion in allowing

the government to introduce a co-defendant's guilty plea when the government did not emphasize it or urge the jury to consider it); Christian, 786 F.2d at 214 (concluding that court's failure to give a cautionary instruction regarding admission of co-conspirator's guilty plea was not plain error).

### 3. Joyce Whitney's Testimony Regarding Anthony Whitney's Guilty Plea

Anthony's wife, Joyce Whitney, testified for the defense. On cross-examination, the government asked Mrs. Whitney two questions to establish that she knew her husband had pleaded guilty to conspiring to burn the cross. The government asserts it elicited such testimony from Mrs. Whitney in order to "test whether she was knowledgeable about all the facts of the case." Aple's Br. at 26. Mr. Whitney argues that our holdings in Austin, 786 F.2d at 992, and Davis, 766 F.2d at 1456, mandate the conclusion that admission of Anthony's guilty plea through the testimony of his wife was error.

Although the defendant is incorrect in suggesting that Austin and Davis speak to this specific issue, Austin does suggest that using such evidence to attack credibility is problematic:

> [U]nder the pertinent case law and Fed. R. Evid. 609(a), it is the testifying witness' own prior conviction that is admissible on cross-examination to impeach his credibility or on redirect to rehabilitate him. We have found no case, and the Government has not cited one, in which

-23-

a conviction other than that of the witness himself was properly admitted on the issue of credibility.

786 F.2d at 992 (citation omitted). We need not decide whether a co-conspirator's guilty plea can be introduced through the testimony of a witness other than the co-conspirator for the alleged purpose of establishing the witness's background knowledge. Here, Anthony Whitney's guilty plea was already in evidence through his own testimony. Given that Mr. Whitney did not object or request a cautionary instruction, and our plain error standard of review, we easily conclude that the cumulative nature of the testimony could not "have had an unfair prejudicial impact on the jury's deliberations." Davis, 766 F.2d at 1456. Accordingly, admission of Anthony Whitney's guilty plea through his wife's testimony was not plain error. See id.

## C. Use of Prior Conviction of "Minor in Possession" in Calculating Criminal History

According to the presentence report, when Mr. Whitney was 19 he was arrested and charged with "Transporting an Open Container; Minor In Possession; and Driving Under the Influence." Rec. vol 2 at 7, ¶ 33 (Presentence Report). As a result of a plea bargain in that matter, Mr. Whitney pleaded guilty to "Minor In Possession." Id. at ¶ 32. At sentencing in the instant case, Mr. Whitney was

assessed one of his two criminal history points for the "Minor In Possession" conviction.

Mr. Whitney contends that use of this conviction in calculating his criminal history was erroneous because "Minor In Possession" constitutes a "juvenile status offense," which the guidelines specifically exclude from criminal history. Because Mr. Whitney objects to inclusion of the "Minor In Possession" offense in his criminal history for the first time on appeal, we review only for plain error. See Fed. R. Civ. Proc. 52(b).

To establish plain error Mr. Whitney "must show:  (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affect[s] substantial rights."   See United States v. Hughes  , 191 F.3d 1317, 1322 (10th Cir. 1999) (citations and quotations omitted),     cert. denied , 120 S. Ct. 1427 (2000).  If these three elements are satisfied, then we "may exercise discretion to correct the error if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'"   United States v. Fabiano  , 169 F.3d 1299, 1303 (10th Cir.) (quoting  United States v. Olano  , 507 U.S. 725, 732 (1993)),    cert. denied , 120 S. Ct. 1311 (1999).

Had the court not included Mr. Whitney's prior "Minor In Possession" conviction in his criminal history, he would have been subject to a guideline range of 18-24 months instead of 21-27 months.  Although, we have held that

-25-

"basing a sentence on the wrong guideline range constitutes a fundamental error affecting substantial rights within the meaning of Rule 52(b)," United States v. Herndon , 982 F.2d 1411, 1419 (10th Cir. 1992), thereby satisfying the third prong of the plain error inquiry, Mr. Whitney cannot establish the second requirement, that, if there was error, it was plain.

As stated previously, an error that is plain is one that is clear and obvious. An error is clear and obvious when it is contrary to well-settled law. See United States v. McSwain , 197 F.3d 472, 481 (10th Cir. 1999), cert. denied , 120 S. Ct. 2024 (2000). The guidelines clearly express that, "juvenile status offenses" are "never counted" in a defendant's criminal history. USSG §4A1.2(c)(2). However, the sentencing guidelines do not define the term "juvenile status offense." United States v. Miller , 987 F.2d 1462, 1465 (10th Cir. 1993). Thus, in order for us to conclude the court's error, if any, was plain, Mr. Whitney would have to establish that his prior conviction of "Minor In Possession" constitutes a "juvenile status offense" within the meaning of USSG §4A1.2(c)(2) under current, well-settled law.

The Tenth Circuit has generally noted that the term "juvenile status offense" has been construed to mean offenses "where otherwise legal conduct is criminalized only because of the actor's status." Id. The Seventh Circuit has similarly stated that "[t]he obvious meaning [of a juvenile status offense] is

-26-

conduct that would be lawful for an adult and is unlawful solely by virtue of the defendant's juvenile status." United States v. Ward , 71 F.3d 262, 263 (7th Cir. 1995). Further, Black's Law Dictionary defines a "status crime" as "[a] type of crime of which a person is guilty by being in a certain condition or of a specific character, such as vagrancy." Black's Law Dictionary 378 (7th ed. 1990); United States v. Williams , 176 F.3d 301, 312 (6th Cir. 1999) (quoting Black's Law Dictionary 1264 (5th ed. 1979)).

Under this plain language definition, Mr. Whitney's conviction of "Minor In Possession" could be construed as a "juvenile status offense," and consequently excluded from his criminal history. His conduct in possessing alcohol was criminal solely as a result of his status as being under the legal drinking age of 21. See Miller , 987 F.2d at 1465.

However, the definition of "juvenile status offense" noted in Miller was merely dicta. The Tenth Circuit has never directly addressed or adopted a test for determining which offenses are "juvenile status offenses" within the meaning of §4A1.2(c)(2). Nor has the Supreme Court spoken directly to this issue. Thus, there is no well-settled law establishing the court made a clear and obvious error in including the "Minor In Possession" offense in Mr. Whitney's criminal history.

Moreover, the law in other circuits that have addressed this issue suggests that the court's failure to exclude Mr. Whitney's prior offense of "Minor In

-27-

Possession" from his criminal history was not plainly wrong. These circuits have concluded that "juvenile status offenses" include only those status offenses committed by persons under eighteen, see United States v. Correa, 114 F.3d 314, 318-19 (1st Cir. 1997) (citations omitted); they must be non-serious offenses, see id.; and regardless of the title of the offense, the underlying conduct would not have been criminal if committed by an adult, see Ward, 71 F.3d at 263.

Applying these holdings, Mr. Whitney's prior conviction of "Minor in Possession" would not be considered a "juvenile status offense" within the meaning of §4A1.2(c)(2) because he committed the offense when he was 19, see Correa, 114 F.3d at 318-19, and because his actual conduct underlying his conviction, "Transporting Open Container" and "Driving Under the Influence," would have been criminal if committed by an adult, see Ward, 71 F.3d at 263. Thus, there is law, albeit not controlling, to support the conclusion that the district court did not plainly err in failing to exclude Mr. Whitney's prior offense of "Minor in Possession" from his criminal history pursuant to §4A1.2(c)(2). We take no position on the correctness of this result.

In sum, the law surrounding the appropriate definition of "juvenile status offense" within the meaning of USSG §4A1.2(c)(2) is unsettled. Accordingly, Mr. Whitney cannot establish plain error. See McSwain, 197 F.3d at 481; see, e.g., United States v. Blackwell, 694 F.2d 1325, 1343 (D.C. Cir. 1982)

(concluding no plain error where "the error was 'plain' to no one at trial and had not been ruled on previously by this court; [and] it . . . involved the interpretation of a relatively recent federal rule, rather than a well-established constitutional or common law right").

III.     **CONCLUSION**

For the foregoing reasons Mr. Whitney's convictions and sentence are AFFIRMED.