**F I L E D**

**UNITED STATES COURT OF APPEALS**

**October 10, 2006**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

VERNOR LEE NORWOOD,

Defendant-Appellant.

No. 05-2276

(D. New Mexico)

(D.C. No. CR-04-1461 JH)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY**, **SEYMOUR,** and **TYMKOVICH**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* FED. R. APP. P. 34(a)(2); 10TH CIR. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Vernor Lee Norwood was charged in a two-count indictment in the United States District Court for the District of New Mexico with (1) conspiracy to

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

possess with intent to distribute 100 kilograms or more of marijuana, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 846; (2) possession with the intent to distribute 100 kilograms or more of marijuana, and aiding and abetting, *see id.* §§ 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2. A jury convicted him on both counts, and he was sentenced to 63 months on each count, to be served concurrently. On appeal, he contends that (1) there was insufficient evidence to convict him of the drug crimes; (2) the district court plainly erred when it allowed the government to introduce certain hearsay statements without first holding an evidentiary hearing; and (3) his counsel provided ineffective assistance. For the following reasons, we affirm.

## I. FACTUAL BACKGROUND

In July 2004, Mr. Norwood's co-defendant, Sam Chehadeh, was working for Wildcat Express, a trucking company in Detroit, Michigan. On July 1, 2004, according to Mr. Chehadeh, another truck driver told Mr. Chehadeh that he had been offered $10,000 to drive a load of marijuana from Phoenix, Arizona to Detroit. Although the driver said that he was not interested, he volunteered to put Mr. Chehadeh in contact with the offeror.

On July 2 or 3, 2004, the other truck driver introduced Mr. Chehadeh to a man that went by "Mazen." Mazen told Mr. Chehadeh that he would pay him $10,000 upon delivery to pick up a load of marijuana in Phoenix and drive it back

to Detroit. Mazen also told Mr. Chehadeh that someone else would ride in the truck with him, handle the money, and exchange it for the marijuana in Phoenix. *Id.* at 56. That person was, according to Mr. Chehadeh, was Mr. Norwood.

Mr. Chehadeh testified that he met Mr. Norwood on July 4, 2004, at a truck stop in Detroit. He stated that Mazen introduced Mr. Norwood to him as "the gentleman that is going to be riding with you." Aple's Supp. App. vol. I, at 59. Mr. Chehadeh did not identify Mr. Norwood as a co-driver in his logbook, and he testified that Mr. Norwood did not ask him to teach him how to be a truck driver, a theory Mr. Norwood later raised in his defense.

According to Mr. Chehadeh, before the pair embarked, Mazen gave him $1,000 and gave Mr. Norwood a small box. Although Mr. Chehadeh never saw the contents of the box, he assumed that it contained the payment for the marijuana. He further testified that Mr. Norwood told him that he had been paid $1,000 a day for similar transactions, and that Mazen would send in a lawyer if there was trouble.

A. The trip to Phoenix

Mr. Chehadeh testified that before heading to Phoenix the truck stopped in Ohio, Georgia and Arkansas, picking up and delivering loads of ketchup and soup. The truck then headed to Arizona. In a small town in Texas, Mr. Chehadeh realized he accidentally left Mr. Norwood behind. Mr. Norwood, who had left the

truck to get some food, sought help from a police officer, who stopped Mr.

Chehadeh about a mile down the road, and Mr. Norwood returned to the truck.

On July 9, 2004, the two arrived in Glendale, Arizona, where Mr. Chehadeh

picked up a load of onions. Mr. Norwood then directed Mr. Chehadeh to a K-

Mart parking lot in Phoenix, where three men met them with a van. Mr.

Chehadeh, Mr. Norwood, and the three men quickly loaded five or six large boxes

from the van into the trailer, on top of the onions.

Later, because Mr. Chehadeh was worried that the boxes would look

suspicious positioned atop the onions, the two stopped at a truck stop on I-15 to

move the marijuana behind the onions. Mr. Chehadeh testified that both he and

Mr. Norwood took the bundles of marijuana out of the boxes and loaded them

behind the onions so that they were not visible when the back of the truck was

open.

B. The arrival at the New Mexico port of entry

At about 2:00 p.m. on July 10, 2004, the truck pulled into the New Mexico

port of entry near the Arizona border. Mr. Chehadeh testified that he told Mr.

Norwood to stay in the bunk in the back of the cab because he knew that the

inspectors would get suspicious if Mr. Chehadeh had a passenger who was not

recorded into his logbook.

Oscar Destea, an inspector with the New Mexico Department of Public

Safety, Motor Transportation Division, looked at Mr. Chehadeh's logbook and

noticed some minor violations. Inspector Destea asked him to move into the inspection yard so that he could conduct an inspection of the truck.

Inspector Destea asked Mr. Chehadeh to step down from the truck and accompany him and another inspector during the inspection. At some point, the inspectors noticed that Mr. Norwood was in the cab of the truck, and they asked Mr. Chehadeh to get him out of the cab. One of the inspectors asked whether Mr. Norwood was a co-driver, and Mr. Chehadeh told him that Mr. Norwood was just a passenger. The inspector then asked Mr. Chehadeh to open his trailer. Mr. Chehadeh believed that the inspector became suspicious when he saw that the onions were not stacked in an orderly fashion on their pallets. Both inspectors climbed on top of the onions and saw that there was something in the trailer other than onions, which they believed was some sort of contraband. Inspector Destea then called the state police, and the other inspector asked Mr. Chehadeh to drive the truck into the inspection bay.

C. Mr. Chehadeh and Mr. Norwood are arrested

Officer Cody Smid responded to Inspector Destea's call and arrested Mr. Chehadeh and Mr. Norwood. Mr. Chehadeh waived his right to remain silent, and, after receiving his *Miranda* warnings, Mr. Norwood also agreed to waive his rights and talk to Officer Smid. When asked by Officer Smid if he knew what was in the trailer, Mr. Norwood replied that there were onions and brown packages. He also said that he was in the truck because he was learning to be a

truck driver. He denied, though, that Mr. Chehadeh was teaching him to drive. He also stated that he had only known Mr. Chehadeh for a week. Then he said, "Well, I don't want to incriminate myself," and Officer Smid stopped questioning him. *See id.* at 154. Later, when Mr. Chehadeh and Mr. Norwood were sitting together in a state police car, Mr. Norwood asked Mr. Chehadeh, "Did you say anything?" Mr. Chehadeh, who had incriminated Mr. Norwood is his discussion with the police, lied and said, "No." *Id.* at 97.

D. The FBI investigation

The New Mexico police eventually turned over the case to the Federal Bureau of Investigation (FBI). After receiving another *Miranda* warning, Mr. Norwood said he had no idea why the FBI agent was interviewing him. He told the agent that he was learning how to drive a truck, and that one day while in a supermarket, he bumped into Mr. Chehadeh and they struck up a friendship. Mr. Norwood said that he asked Mr. Chehadeh if he would teach him how to drive a truck, and that Mr. Chehadeh agreed. A few days later, Mr. Chehadeh called Mr. Norwood and told Mr. Norwood to meet him on July 4, 2004.

Mr. Norwood stated that he was unaware of the details of the trip to Georgia. He did say, however, that he met his cousin, Reverend Byrd, somewhere on the road in Georgia. Mr. Norwood did not know where they went from Georgia but understood that at some point they were in Texas. Mr. Norwood

told the agent he never got out of the truck except to go to the bathroom and to eat. He said he did not know what happened in Phoenix, and that he never got out of the truck in Phoenix. He said he did not know what was in the truck and denied any involvement with any of the packages inside the truck.

When the FBI agent told Mr. Norwood that he was going to fingerprint every package, Mr. Norwood said he remembered loading some of the packages, but denied knowing anything more. The fingerprints found on the packages did not match Mr. Norwood's.

Mr. Norwood told the agent that he mostly stayed in the back of the truck during the trip. He stated that he did not help fill out the logbook, and he did not otherwise help load or unload the truck. The FBI agent did not believe Mr. Norwood's version of events and terminated the interview.

About three days after Mr. Norwood's arrest, another FBI agent, Oscar Ramirez, fingerprinted Mr. Norwood. Agent Ramirez indicated that Mr. Norwood blurted out "that he was scared, [and] that he had been forced into doing it." *Id*. vol. II, at 60. Apparently, Mr. Norwood remarked that someone in his family had cancer, and that he "knew what those blocks were, . . . but [he] just had to do it." *Id*. at 60-61.

Toward the end of the encounter, Mr. Norwood broke down and started crying. He said that during the last three days, "he had talked to God and that God had told him to do the right thing." *Id*. at 61. Mr. Norwood was very

emotional and hugged the agent. *Id.* Agent Ramirez testified he became concerned because he was wearing his duty weapon, so he pushed Mr. Norwood away and told the case agent, Agent Steve Chambers, what he had learned.

Agent Chambers then had Mr. Norwood step into an interview room, and began questioning him about the information Agent Ramirez had relayed to him. Although Mr. Norwood was still visibly upset, he told Agent Chambers that he did not know what he was talking about.

E. Mr. Norwood's testimony

Mr. Norwood testified that he met Mr. Chehadeh on July 4, 2004, through Mr. Chehadeh's cousin, who took Mr. Norwood to a grocery store. There, he met Mr. Chehadeh and then left with him in the truck. Mr. Norwood stated that he wanted to learn to drive a truck to make some money. He stated that Mr. Chehadeh taught him how to shift gears on the semi-tractor trailer and showed him the logbook and other items in the truck and trailer.

Mr. Norwood testified that he told Mr. Chehadeh that he had to be back in Detroit by the next Friday because his cousin, Reverend Byrd from Georgia, was going to be staying with him. Mr. Norwood said that in Georgia, he had his cousin Reverend Byrd meet him alongside the road so that he could give him the keys to his home. He also described the time when Mr. Chehadeh left him behind in Texas, although he testified that Mr. Chehadeh knew Mr. Norwood was not in the truck when he drove off.

Mr. Norwood testified that they picked up some onions somewhere in Arizona, and that this load was the only one he saw being placed on or removed from the truck during the entire trip. He also denied helping to load the boxes of marijuana into the truck. He further denied receiving money to exchange for marijuana in Phoenix.

On cross-examination, Mr. Norwood testified that he went to sleep after the onions were loaded, and he did not know whether Mr. Chehadeh made any subsequent stops other than a stop at a restaurant. Mr. Norwood also testified that he received a check each month from his former employer, General Motors, for slightly over $600, and that he earned extra money by doing odd jobs and "flipping" houses. He testified that he owned about five homes and seventeen cars.

Mr. Norwood also testified that he is a diabetic and indicated that if his blood sugar got very low, he became easily confused, incoherent, and his vision became blurred. Mr. Norwood testified that when he was in the port of entry, he did not get a chance to check his blood sugar, and he was ailing by the time the law enforcement officers began to question him.

Mr. Norwood admitted that he understood both the questions that the law enforcement officers asked and the content of his answers. One of the agents who questioned him testified that Mr. Norwood seemed lucid, and that all his answers were consistent with the questions asked. The agent testified that Mr. Norwood

did not appear ill, nor did he ever indicate that he was not feeling well during the interview.

A few days later, when the agent was transporting him to Albuquerque, New Mexico, Mr. Norwood said that he was feeling ill and mentioned his medication, which he did not have with him. When they arrived in Albuquerque, the agent called the detention center where Mr. Norwood had been held and was informed that the detention center did not have any medication for Mr. Norwood. The agent also checked all of Mr. Norwood's belongings and the truck, but did not find any medications.

## II. DISCUSSION

Mr. Norwood argues that there was insufficient evidence to support his conviction; that the district court committed plain error by not holding an evidentiary hearing regarding the admission of Mr. Norwood's statements to a law enforcement officer into evidence; and that his trial counsel was ineffective because she failed to object to certain testimony. For the reasons stated below, we reject Mr. Norwood's contentions and affirm his conviction.

### A. Sufficiency of evidence

Mr. Norwood contends that the evidence was insufficient for the jury to convict him on the charges of conspiracy and possession of marijuana. He argues that the evidence presented by the government showed only proximity to the illegal activity, but that the only testimony given was from an alleged co-

conspirator that was not corroborated by any credible evidence. We review this claim de novo, "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government," and reversing the conviction "only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Toles*, 297 F.3d 959, 968 (10th Cir. 2002) (internal quotation marks omitted).

We are not persuaded by Mr. Norwood's argument. To establish conspiracy, the government was required to prove that (1) Mr. Norwood and at least one other person agreed to violate the law, (2) Mr. Norwood knew at least the essential objectives of the conspiracy, (3) he knowingly and voluntarily became part of the conspiracy, and (4) the alleged coconspirators were interdependent. *See United States v. Ivy,* 83 F.3d 1266, 1285 (10th Cir. 1996) (citation and quotation marks omitted). A jury is permitted to infer an agreement "from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." *United States v. Johnson,* 42 F.3d 1312, 1319 (10th Cir. 1994). "A jury may presume a defendant is a knowing participant in the conspiracy when he or she acts in furtherance of the objective of the conspiracy." *United States v. Carter*, 130 F.3d 1432, 1440 (10th Cir. 1997). Interdependence is established when "each coconspirator's activities constitute essential and integral steps toward the realization of a common, illicit goal." *Id.*

-11-

To prove Mr. Norwood guilty of count 2 – possession of 100 kilograms or more of marijuana with intent to distribute – the government was required to prove (1) that Mr. Norwood possessed more than 100 kilograms of marijuana, (2) that he knew that it was marijuana, and (3) that he intended to distribute it. *See United States v. Jenkins*, 175 F.3d 1208, 1216 (10th Cir. 1999). "For purposes of this test, possession may be either actual or constructive. Constructive possession occurs when a person knowingly has ownership, dominion or control over the narcotics and the premises where the narcotics are found. Although constructive possession may be shown by circumstantial evidence, the government must show a sufficient nexus between the defendant and the narcotics." *Id.* (internal citations and quotation marks omitted). In cases involving joint occupancy of a vehicle in which narcotics are found, "[t]he government must present some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the [narcotics]." *United States v. McKissick,* 204 F.3d 1282, 1291 (10th Cir. 2000) (internal citation and quotation marks omitted).

Viewed in the light most favorable to upholding the verdict, we hold that there is more than sufficient evidence to support Mr. Norwood's convictions. There is no dispute that Mr. Norwood was riding as a passenger in a truck that contained more than 300 kilograms of marijuana. Mr. Chehadeh, the driver of the truck, testified that Mr. Norwood carried the money to pay for the marijuana, arranged for the meeting place to pick up the marijuana, and helped load and

rearrange the marijuana in the back of the truck. According to Mr. Chehadeh, Mr. Norwood told him that he had done this before, that he had been paid $1,000 per day for the earlier transaction.

Even without knowing that Mr. Chehadeh and Mr. Norwood intended to deliver the marijuana to someone in Detroit (and thereby distribute it), we agree with the government that the jury could reasonably infer from the quantity of the marijuana that Mr. Norwood intended to distribute it. The jury had ample evidence from which it reasonably could conclude that Mr. Norwood, with Mr. Chehadeh, had constructive possession of the marijuana, knew that it was in the truck, and intended to distribute it.

Mr. Norwood argues that his flagging down a police officer in Texas to help him catch up to Mr. Chehadeh, who accidentally had left him behind, demonstrates that he did not know about the marijuana in the truck. However, the incident in Texas took place before the two loaded the marijuana into the truck. Thus, Mr. Norwood knew there was no marijuana in the truck, and he had no reason to worry about stopping the police officer.

B. Lack of Evidentiary Hearing Regarding Certain Hearsay

Mr. Norwood contends that the district court should have held a hearing on the admissibility of his statements to Officer Smid. Mr. Norwood acknowledges that he did not file a motion to suppress nor ask the district court to hold a hearing on the admissibility of these statements, and that consequently we review

the issue for plain error.  To establish plain error, Mr. Norwood "must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affect[s] substantial rights."  *United States v. Whitney*, 229 F.3d 1296, 1308 (10th Cir. 2000); *United States v. Olano*, 507 U.S. 725, 734 (1993).

 If Mr. Norwood is able to satisfy these three elements, then this Court "may exercise discretion to correct the error if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  *Whitney*, 229 F.3d at 1308 (internal quotation marks omitted).  "Although the rigidity of the plain-error rule is relaxed somewhat when a potential constitutional error is involved, the defendant bears the burden of demonstrating that he was prejudiced by the error before this court can grant him relief."  *United States v. Toro-Pelaez*, 107 F.3d 819, 827 (10th Cir. 1997) (internal citation omitted).

If a defendant speaks to a law enforcement officer after having been advised of his or her right to remain silent, the government must prove by a preponderance of the evidence that the defendant's waiver of the right was voluntary.  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  The waiver may be inferred from the defendant's actions and words; an express waiver is not required.  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

To show a voluntary waiver, the government must establish (1) that the waiver was the result of free and deliberate choice instead of intimidation, coercion, or deception, and (2) that the defendant waived the right while fully

-14-

aware of the nature of the right being waived and the consequences of waiving. *Moran v. Burbine,* 475 U.S. 412, 421 (1986). To determine whether a statement was coerced, we consider the defendant's characteristics, the circumstances surrounding the statement, and the police tactics used to obtain the statement. *See United States v. Guerro,* 983 F.2d 1001, 1004 (10th Cir. 1993).

After Mr. Norwood received his *Miranda* warnings, he initially agreed to waive his rights and talk to Officer Smid. Officer Smid asked Mr. Norwood if he knew what was in the trailer, and Mr. Norwood replied "that there [were] brown packages [and] onions in the trailer." Aple's Supp. App. vol. I, at 153. According to Officer Smid, Mr. Norwood told him "he was learning to be a commercial truck driver." *Id.* When asked how long he had known Mr. Chehadeh, Mr. Norwood replied he had known him for a week. Then he said, "Well, I don't want to incriminate myself," and Officer Smid stopped questioning him. *Id.* at 154.

According to the testimony of Agent Chambers, approximately three days later Mr. Norwood again volunteered testimony, this time that "that he was scared, [and] that he had been forced into doing it." Aple' Supp. App. vol. II, at 60. Mr. Norwood also told him that he felt it was necessary to take part and drive with Mr. Chehadeh. He said that he "knew what those blocks were, . . . but [he] just had to do it." *Id.* at 60-61. Toward the end of the encounter, Mr. Norwood

broke down and started crying. He said that during the last three days, "he had talked to God and that God had told him to do the right thing." *Id*. at 61.

Mr. Norwood contends that these alleged statements, which he denies were made, could have only resulted from Agent Ramirez's "intimidation, coercion or deception." Aplt's Br. at 23. Implicit in the jury's guilty verdict is that Mr. Norwood's denial of knowledge of the marijuana in the truck and his involvement in the scheme lacked credibility. Furthermore, "there is no evidence suggesting Mr. [Norwood] was unusually susceptible to coercion because of age, lack of education, or intelligence." *United States v. Roman-Zarate,* 115 F.3d 778, 783 (10th Cir. 1997). When viewed in the context of the entire record at trial, we cannot say that admitting these statements affected Mr. Norwood's "substantial rights." *Olano*, 507 U.S. at 734.

C. Ineffective assistance of counsel

Finally, Mr. Norwood contends that his counsel provided ineffective assistance of counsel when she failed to object to Mr. Norwood's testimony and that of other government officials. In this circuit, except in rare circumstances, ineffective assistance of counsel claims must be presented in collateral proceedings. *United States v. Galloway,* 56 F.3d 1239, 1240 (10th Cir. 1995). This rule allows a district court to develop the factual record necessary for effective review. *See Massaro v. United States*, 538 U.S. 500, 505-06 (2003). The present claim does not fall into the narrow category of cases that require no

-16-

further development and are therefore suitable for review on direct appeal. *Cf. United States v. Smith*, 10 F.3d 724, 728 (10th Cir. 1993) (finding the record sufficient to review an ineffective assistance of counsel claim on direct appeal where defense counsel averred to mistakenly omitting a jury instruction on a lesser included offense). Accordingly, if Mr. Norwood intends to pursue this claim further, he must raise it in a collateral proceeding under 28 U.S.C. § 2255.

## III. CONCLUSION

Accordingly, we AFFIRM Mr. Norwood's conviction.

Entered for the Court,


Robert H. Henry
Circuit Judge